**EXHIBIT B**

**Select Service**

**HOTEL MANAGEMENT AGREEMENT**

**between**

**OLYMPIA HOTEL MANAGEMENT, LLC**

**AND**

**RIVER EAGLE HOTELS LLC**

May 9, 2014

## TABLE OF CONTENTS

ARTICLE I ........................................................................................................................................ 1
GENERAL ...................................................................................................................................... 1
1.1    Appointment and Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.3    Compliance with Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.4    Compliance with Financing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
ARTICLE II .................................................................................................................................... 3
OPERATIONS .............................................................................................................................. 3
2.1    Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.2    Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.3    Permits; Compliance with Laws, Licenses, Mortgages, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.4    Financial Management, Budget and Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.5    Collection of Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.6    Maintenance and Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.7    Capital Expenditures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.8    Goods and Services Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.9    Emergencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.10   Sales and Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.11   Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
2.12   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
2.13   Reservation and Credit Card System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.14   Negotiations with Retail Tenants and Concessionaires . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.15   Publicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.16   Use of Affiliates by Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.17   Furniture, Fixtures & Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.18   Supplies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.19   Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.20   Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.21   Designated Owner's Representative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
ARTICLE III .................................................................................................................................. 12
OPERATING ACCOUNT ............................................................................................................ 12
3.1    Operating Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
3.2    Costs Eligible for Payment from Operating Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
3.3    Insufficient Gross Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
ARTICLE IV .................................................................................................................................. 16
COMPENSATION ........................................................................................................................ 16
4.1    Base Management Fee. ........................................................................................ 16
4.2    Termination Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
ARTICLE V ................................................................................................................................... 17
TERMINATION ........................................................................................................................... 17
5.1    Termination by Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
5.2    Termination by Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
5.3    Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
5.4    Post-Termination Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
5.5    Indemnity Upon Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE VI......................................................................................................................................... 21
INDEMNIFICATION ......................................................................................................................... 21
6.1   Operator Indemnity. ........................................................ 21
6.2   Owner Indemnity. .......................................................... 21
6.3   Survival. ................................................................ 21
ARTICLE VII........................................................................................................................................ 21
MISCELLANEOUS ............................................................................................................................ 22
7.1   Notices ................................................................. 22
7.2   Survival ................................................................. 23
7.3   Governing Law; Venue ...................................................... 23
7.4   Integration; Modification; Waiver .......................................... 23
7.5   Counterpart Execution ..................................................... 23
7.6   Headings; Construction ..................................................... 23
7.7   Agent Only for Owner ...................................................... 23
7.8   Invalid Provisions ......................................................... 24
7.9   Binding Effect ............................................................ 24
7.10  Complimentary Rooms ...................................................... 24
7.11  Collateral Assignment and Subordination .................................... 24
7.12  Force Majeure Delay ....................................................... 24
7.13  Assignment of Agreement ................................................... 25

THIS HOTEL MANAGEMENT AGREEMENT (the "**Agreement**") is made and entered into this 9th day of May, 2014, by and between River Eagle Hotels LLC, an Illinois limited liability company (herein referred to as "**Owner**"), with a mailing address C/O Beitler Hotels, LLC, 980 North Michigan Avenue, Suite 1225, Chicago, Illinois 60611, Attn:  John Paul Beitler III, and Olympia Hotel Management LLC, a Delaware limited liability company with a mailing address of P.O. Box 508, Portland, ME 04112 (hereinafter referred to as "**Operator**").

## RECITALS

1.        Owner desires to construct a nationally flagged select service hotel consisting of, among other things, approximately 128 rooms, at the multi-use development known as Fountainhead at Quad Cities, located in the City of East Moline, Illinois ("**Hotel**").

2.        In connection with Owner's ownership of the Hotel, Owner desires to enter into a Hotel Management Agreement with Operator to provide for the management of the Hotel and the Operator desires to manage the Hotel.

3.        Operator has the knowledge and expertise to manage and operate the Hotel in a first class manner on behalf of Owner pursuant to the terms herein.

## AGREEMENT

In consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

ARTICLE I

GENERAL

1.1      Appointment and Term.

(a)        Owner hereby appoints Operator as the manager of the Hotel with the sole and exclusive obligation and authority, subject to the limitations and conditions herein, to direct, supervise, manage, and operate the Hotel as the agent, and for the account, of Owner. The term of this Agreement shall be five years (5) years commencing on the Opening Date (as defined herein) of the Hotel (the "**Initial Term**").  For purposes of this agreement, the "**Opening Date**" shall mean the date the Hotel commences operations which is anticipated to be on or before August 2015.  This Agreement may be renewed for two (2) additional periods of five (5) years each (each a "**Renewal Term**") by either Owner or Operator upon written notice of renewal of this Agreement provided by Operator to Owner, or Owner to Operator, as the case may be, no later than one hundred eighty (180) days prior to the first day of each applicable Renewal Term.  The Initial Term and/or any Renewal Term are referred to herein as the "**Term**".

1.2      Management. Operator agrees to direct the management and operation of the Hotel in a first class manner and in accordance with the conditions and provisions set forth in this Agreement

and any Franchise Requirements (as defined herein). Operator shall be responsible for: consultation with Owner pertaining to Owner's rental of guest rooms, operation of any restaurants, lounges, function rooms and other public facilities, including the advertising and promotion thereof; the maintenance and repair of the property; the hiring, promoting and discharging of staff as necessary; and other responsibilities required in the normal operation of the Hotel. Operator shall also have direct responsibility for the maintenance of adequate systems of recordkeeping and reporting. Operator acknowledges that Owner may develop and operate either directly or through a lease, management contract or similar arrangement with a third-party owner or operator, a so-called "standalone" restaurant/bar or similar food and beverage business located in or about the Hotel and/or the parcel on which the Hotel is located ("Independent Restaurant"); provided, however, that the Hotel will own and Operator will manage the food and beverage facilities required to satisfy the Franchise Requirements, and the Independent Restaurant shall not be the facility utilized in order to satisfy the Franchise Requirements.

      1.3    Compliance with Franchise.  To the extent applicable, Operator shall comply and shall assist Owner in assuring compliance with any and all franchise agreements ("**Franchise**") entered into by Owner for the Hotel ("**Franchise Requirements**"). Operator shall only be responsible for compliance with such Franchise Requirements as are within its control, and for advising the Owner of requirements that require action, decisions or investment by the Owner. Operator is not responsible for compliance with Franchise Requirements that require action, decisions or investment by the Owner. References throughout this Agreement to Operator's compliance with Franchise Requirements shall be applied based on the foregoing understanding. Owner shall have the authority to approve any amendments, modifications or changes to any Franchise, in its sole discretion, provided, however, that Owner shall consult with Operator in connection with establishing any Franchise and/or making any amendments, modifications or changes to any Franchise during the term or any renewal term of this Agreement.

      1.4    Compliance with Financing Requirements.  To the extent applicable, Operator shall assist Owner in assuring compliance with all the terms, conditions and obligations contained in any mortgage, lease or other agreement executed by Owner relating to the Hotel. Owner shall notify Operator of any such mortgage, lease or agreement. Operator shall execute such agreements in favor of the holder of such mortgage, lease or other agreement as Owner may reasonably request in order to collaterally assign Owner's interest in this Agreement or subordinate this Agreement to any mortgage, lease or other agreement executed by Owner with any financial institutions providing financing for the Hotel, provided that such agreements are in customary form reasonably acceptable to Operator.

      1.5    Restriction.  During the Initial Term of this Agreement, without the prior written consent of the Owner, which consent may be withheld in Owner's sole and absolute discretion, Operator shall not provide hotel management services for nor own, lease, license and/or operate any hotel or other establishment providing similar lodging accommodations that is located in whole or in part within a five (5) mile radius of the Hotel (the "**Restricted Area**") and Operator shall not permit any person or entity affiliated with Operator to provide hotel management services for or otherwise own, lease, license and/or operate any hotel or other establishment providing similar lodging accommodations within the Restricted Area; provided, however, that the foregoing restriction shall not apply to Operator serving as the hotel manager for other hotels developed within the Restricted

Area by Owner, or its affiliates.

## ARTICLE II

## OPERATIONS

2.1    Personnel.  Operator shall be responsible for the hiring, promoting, discharging and supervising all staff, and all such individuals and persons shall be employees of Operator. All such employees shall be on Operator's payroll and Owner shall not be responsible or liable for employees' wages or withholding for tax purposes.  All costs of staffing at the Hotel shall be consistent with the Annual Business Plan and shall be paid through the Operating Account.  Operator will consult Owner in developing a compensation package, fringe benefit program, employee handbook and other collateral materials necessary for personnel administration. Owner shall have no right to hire, terminate, supervise or direct the Operator's employees; provided, however, notwithstanding the foregoing, Owner shall have the right, in the exercise of its reasonable discretion, to approve the hiring by Operator of any member of the Executive Staff (as defined herein).  The term "**Executive Staff**" shall mean any general manager, a food and beverage director (or similar), any controller at the Hotel (or similar) and any director of sales (or similar).

2.2    Policies.  Operator shall be responsible for determining the operating policies, standards of operation, quality of service and other matters affecting customer relations or the efficient management and operation of the Hotel, including, without limitation, determining compliance with any Franchise Requirements.  Operator will consult with Owner regarding all such policies and standards and shall incorporate all commercially reasonable requests, revisions and/or comments made by Owner to such operating policies, standards of operations, quality of service and other matters affecting customer relations or the efficient management and operation of the Hotel. Owner and Operator shall keep each other advised of all policy matters affecting the Hotel.

2.3    Permits; Compliance with Laws, Licenses, Mortgages, Etc.  Owner shall apply for, process, obtain and maintain all necessary federal, state and local licenses and permits pertaining to the ownership and operation of the Hotel, including alcoholic beverages licenses and permits. Operator shall investigate and confirm that all necessary licenses and permits required for the conduct of the business of the Hotel are currently in effect and that the Hotel is being operated in accordance with all applicable laws, statutes, rules, regulations, ordinances and directives of all duly constituted governmental authorities with jurisdiction thereover.   Operator shall take all commercially reasonable measures and provide all necessary assistance to the Owner in applying for and maintaining such licenses and permits, including the preparation and provision to Owner of applications for renewals of such licenses and permits.  To the extent required by the governmental authority to which application is made for a license or permit, the Operator will be a co-applicant, or applicant, and process and take all commercially reasonable steps to procure and keep in effect any permits or licenses that require the Operator to be an applicant or co-applicant.  All costs associated with applying for and maintaining such licenses and permits shall be included in the Annual Business Plan and paid from the Operating Account.

2.4    Financial Management, Budget and Report.  Operator shall furnish the supervisory

{M4257934.1}                    {M4257934.1}                                               3

services of its own accounting department for purposes of providing the financial management, budgeting and reporting services described below.

(a)     Operator shall maintain for Owner proper and suitable records and books of account to be kept in accordance with generally accepted practices in the hotel industry.  All such books of account shall at all times be open to inspection and audit by any of Owner's officers, members and/or managers or duly authorized representatives, lenders, agents, accountants and attorneys.  Operator shall retain all documentation arising out of the operation of the Hotel as required by any applicable record retention requirement imposed on Operator or Owner by any tax or other authority, and otherwise for a period of at least three (3) years.  Copies of all such materials shall be provided to the Owner upon request, during the Term of this Agreement and for a period of three (3) years thereafter.  Operator shall not erase, delete, discard or destroy any such documentation arising out of the operation of the Hotel without thirty (30) days' prior notification to Owner, which may then take possession of such documents at its own cost and expense.

(b)     Operator shall be responsible for the preparation and submission of an annual business plan ("**Annual Business Plan**") for each Fiscal Year of the Hotel, which shall contain the information, and shall be submitted and approved based on the process, hereinafter described.  The "**Fiscal Year**" of the Hotel shall be the 12 month period ending December 31.  The Annual Business Plan shall contain the following items: (i) the Operating Budget, (ii) the Sales and Marketing Plan, and (iii) the Capital Improvement Plan and Budget, as such terms are defined below.

(c)      The Annual Business Plan shall be prepared, proposed and approved utilizing the following process:

(i)      Operator shall prepare a preliminary Annual Business Plan for each Fiscal Year, or any portion thereof in which the Hotel will be in commercial operation.

(ii)     The preliminary Annual Business Plan for the Hotel's Fiscal Year in which the Opening Date occurs, or portion thereof, shall be prepared, submitted to the Owner and approved based upon a schedule to be reasonably agreed upon between the Operator and Owner approximating as nearly as possible the annual process described below and substituting the Opening Date for the beginning of the Fiscal Year.

(iii)    Following the Opening Date, Operator shall annually prepare and deliver a preliminary Annual Business Plan to the Owner on or before November 30th.  Within fifteen (15) days of Owner's receipt of the preliminary Annual Business Plan from Operator, Operator shall make a formal presentation of the Annual Business Plan and the underlying rationale to Owner on site at the Hotel (or such other location as mutually acceptable to Owner and Operator) with respect thereto.  At this meeting and presentation, it is anticipated that Owner and Operator will agree to certain changes to the Operator's preliminary Annual Business Plan which will then be made by Operator.  Within fifteen (15) days of completion of the formal presentation of the preliminary Annual Business Plan to Owner, Operator shall submit a revised Annual Business Plan to Owner for review and approval.

(iv)     Owner shall have thirty (30) days from the date of its receipt of the revised Annual Business Plan submitted by Operator to notify Operator in writing of any objections thereto. If Owner does not so notify Operator within the aforesaid thirty (30) day period, then the revised Annual Business Plan shall be deemed approved by Owner. If Owner objects to all or part of any Annual Business Plan proposed by Operator, Owner shall furnish Operator with the reasons for its objections and Operator and Owner shall in good faith negotiate a mutually satisfactory Annual Business Plan.

(v)     Until the Annual Business Plan is approved, Operator shall manage, operate, and maintain the Hotel in accordance with its reasonable business judgment and consistent to the extent applicable with the most recently approved Annual Business Plan. In the event of a major dispute between Owner and Operator regarding the approval of the Annual Business Plan, Owner shall have the option of engaging a mediator reasonably acceptable to both parties to resolve such dispute. Any and all associated expense shall be paid out of the Operating Account.

(d)     Each Annual Business Plan presented for Owner's approval and any budgets, reports, or projections prepared by Operator shall be prepared in good faith based on Operator's experience and reasonable expectations for the Hotel's performance, however, Owner acknowledges that Operator makes no guarantee, warranty, or representation regarding the attainability of the Annual Business Plan or any budgets, reports, or projections prepared by it or that there will be profits or that there will not be losses from the operation of the Hotel.

(e)     Set forth below is a description of each of the components of the Annual Business Plan.

(i) The "**Operating Budget**" shall include the following elements:

(A)     Detailed projected monthly profit and loss statement (by line item detail) for the upcoming Fiscal Year compared to the two prior Fiscal Years;

(B)     Rationale/variance report comparing the estimated budgeted performance of the Hotel to the current and prior year;

(C)     Employee roster by department to include all positions, current and proposed salary/wage rates, and benefits for upcoming Fiscal Year compared to two prior Fiscal Years;

(D)     Any proposed bonus plan, estimated payout and criteria or performance measurements by employee or employment category;

(E)     Projected monthly amounts of any and all amounts paid to Operator or any affiliate of Operator;

(F)     Any proposed equipment leases, space leases at the Hotel, licenses, concessions or similar arrangements;

        (G)     A schedule of the Hotel room rentals, meeting room rentals, restaurant and lounge revenue, and miscellaneous income; and

        (H)     A schedule of expected special repairs and maintenance.

    (ii)     The "**Sales and Marketing Plan**" shall include the following elements:

        (A)     A monthly sales and marketing activity report by employee;

        (B)     Top 20 Demand Generators, volume and pricing for FY, Prior FYE;

        (C)     Pricing policy for all Hotel services (Rooms and Food & Beverage at a minimum);

        (D)     Competitive set analysis; and

        (E)     Revenue management strategy (Rooms pricing).

    (iii)    The "**Capital Improvement Plan and Budget**" shall include estimated capital expenditures by month for the upcoming Fiscal Year, together with a five (5) year forecast by line item with cost estimates.

    (f) Operator agrees to use commercially reasonable efforts to ensure that the actual costs of maintaining and operating the Hotel for such period shall not exceed the Operating Budget pertaining thereto, either in total or in any one accounting category. The parties acknowledge and agree that variable costs are subject to increase proportional to an increase in the revenues of the Hotel. All expenses shall be charged to the proper account as specified in the approved Operating Budget, and no expense may be classified or reclassified for the purpose of avoiding an excess in the budgeting amount of an accounting category unless and until approved by Owner.

    (g)    Operator shall provide monthly (or otherwise as provided herein) operating reports ("**Monthly Operating Reports**") to the Owner containing the following elements, which shall be in form and substance reasonably acceptable to Owner:

        (i)     On a weekly basis, the weekly "owners report" for the Hotel that contains such reasonable information requested by Owner and shall otherwise include updates on status of bookings, etc.;

        (ii)    On a monthly basis, on or before the end of each calendar month, for the prior month;

            (a)     Balance Sheet;

            (b)     Cash Flow Report;

(c)     Detailed monthly profit and loss statement and year-to-date profit and loss statement;

(d)     Variance report comparing the actual performance of the Hotel to the Annual Business Plan and the prior Fiscal Year; and

(e)     Any other operating reports as may be reasonably requested by Owner.

2.5     Collection of Revenues.  Operator shall use diligent efforts to collect all revenues, deposits, and other charges which may become due Owner at any time from occupants, patrons, or others for sales or services provided in connection with or for the use of the Hotel or any portion thereof.  In addition, Operator shall collect any income due Owner from miscellaneous sales and services provided to occupants or the public, including, but not limited to, occupant storage and coin-operated machines of all types.  All funds received by the Operator in connection with the operation of the Hotel shall be funds of the Owner and shall be held in trust by the Operator for the Owner and deposited by the Operator in the Operating Account in accordance with the terms of this Agreement. Operator shall not be required to bring suit to collect any revenues, except as specifically directed by the Owner, in which case the Owner shall be responsible for paying all fees, costs and expenses related to any such collection action, including all legal fees and court costs.

2.6     Maintenance and Repairs.   Operator shall be responsible for arranging and supervising all necessary maintenance and repair of the personal property at the Hotel and general maintenance of the real property, provided, however, Operator shall have no authority to replace personal property at the Hotel or to make improvements to the real property without the prior written consent of the Owner, except to the extent set forth in Section 2.7 below.  The Operator shall consult with the Owner regarding the general scope and extent of its maintenance and repair policies and program for the Hotel.  All costs of maintenance and repair at the Hotel shall be consistent with the Annual Business Plan and shall be paid through the Operating Account.

2.7     Capital Expenditures. (a) Operator shall establish, with Owner's approval, a Capital Improvement Plan and Budget for the Hotel for the Initial Term and each Renewal Term, if applicable, of this Agreement, which shall be updated annually throughout the Initial Term and any Renewal term, in accordance with Section 2.4. The Capital Improvement Plan and Budget shall contain provisions for (i) usual and ordinary maintenance capital improvements ("**Maintenance Cap Ex**") and (ii) major capital improvements, which shall mean any single capital improvement, or series of related capital improvements constituting a unitary property improvement program, with a cost in excess of $50,000 ("**Major Cap Ex**").

(b)  Operator shall be responsible for arranging and supervising all Maintenance Cap Ex described in the approved Capital Improvement Plan and Budget. The Owner shall be responsible for arranging and supervising all Major Cap Ex described in the approved Capital Improvement Plan and Budget.  In the event the Owner desires to have the Operator manage any Major Cap Ex, the Owner and the Operator shall establish a separate agreement pursuant to which the Operator's responsibilities and compensation for services rendered in managing Major Cap Ex would be established.

(c) All costs and expenditures associated with implementing the Maintenance Cap Ex for the Hotel shall initially be paid through the Operating Account, with such expenditures to be reimbursed from any established replacement reserve or any other applicable reserve maintained by Owner's mortgage lender, for which Operator agrees it shall apply (or assist Owner to apply); provided, however, that in the event such costs and expenditures require amounts in excess of monies available in the Operating Account, as determined by Operator in its reasonable judgment, Owner shall deposit into the Operating Account sufficient funds to finance the Maintenance Cap Ex and any required Major Cap Ex as a precondition to Operator undertaking any such improvements. Operator and Owner shall consult in good faith regarding the amount and timing of any deposits necessary to implement the Maintenance Cap Ex and any Major Cap Ex.

2.8    Goods and Services Contracts. Operator shall, subject to the Annual Business Plan, negotiate contracts for goods, services and utilities reasonably necessary or desirable in connection with the operation of the Hotel in the usual course of business, including, but not limited to, utility services, vermin extermination, Hotel security, trash removal, elevator and boiler maintenance, heating and air conditioning maintenance, master television antenna services, telecommunications and internet connectivity services, laundry and dry cleaning services and all necessary supplies. Operator shall be authorized to enter into such service contracts in Owner's name acting as Owner's agent for such purposes provided that (a) the same are included in and are consistent with the Annual Business Plan, (b) such service contracts are cancelable on not more than thirty (30) days' notice, (c) such contract is not with an affiliate of the Operator, (d) a copy of any contract entered into in Owner's name shall be immediately sent to Owner, (e) contract term does not exceed one year (subject to the aforesaid 30-day termination right), and (f) termination fee of contract does not exceed $1,000. Owner shall have the right to direct Operator to terminate a service contract. Operator shall exercise commercially reasonable efforts to terminate any such service contract, provided that such request shall be subject to the condition that termination of the service contract does not violate applicable law and termination is consistent with the terms of the contract, as determined by Operator in its reasonable discretion.

2.9    Emergencies. In the event of an emergency situation requiring prompt action for the protection and safety of the Hotel and its occupants, Operator shall exercise commercially reasonable efforts to make necessary repairs without Owner's prior consent, provided adequate funds to pay for the cost of such repairs are available in the Operating Account, including the Capital Improvement Sub-Account, (whether or not dedicated to that purpose) or are otherwise made available by the Owner. Operator shall not be required to expend any of its own funds in making any such repairs. Operator shall provide Owner with prompt notice of any such emergency. Operator shall notify Owner of any emergency expenditures or repairs in advance of making a commitment for the same, provided that advance notice is reasonably practicable under the circumstances and recognizing that the Operator's priorities in an emergency situation are to protect the health and welfare of all persons in and around the Hotel premises and the Hotel property prior to notifying and obtaining any approval from the Owner regarding the cost of addressing an emergency.

2.10    Sales and Marketing. Operator shall prepare and submit to Owner a marketing budget and plan, in accordance with the provisions of Section 2.4 hereof. Operator shall implement the Sales and Marketing Plan, which shall provide for advertising, marketing and publicity plans and

promotional material in accordance with the Annual Business Plan and in compliance with applicable laws, license requirements and/or Franchise Requirements, to be used to further Hotel revenues. Operator shall not use Owner's name in any advertising and promotional material without Owner's express prior approval in each instance. All costs and expenses of advertising, marketing and promotional plans and materials shall be paid out of the Operating Account to the extent included in the Annual Business Plan approved by Owner.

2.11    Insurance.

(a)    Owner and Operator will arrange for and maintain the insurance policies assigned to each party pursuant to **Schedule A** attached hereto and incorporated herein by reference, providing the coverage amounts specified therein. Owner shall have the right to approve the insurance carrier and form and substance of the required policies, which approval will not be unreasonably withheld provided the carrier has an AM Best rating of A VII or better, and insurance is consistent with industry standard.

(b)    In the event Owner determines that the specified insurance and coverage limits are not sufficient, then Owner shall have the right to revise and/or add the types and categories of insurance and/or increase the amounts of insurance required to be maintained. In the event that the specified insurance and coverage limits are not available at a reasonable cost, Owner and Operator shall cooperate to determine any required alterations in such insurance. All costs and expenses associated with establishing and maintaining insurance coverages shall be paid out of the Operating Account.

(c)    Owner (and any persons or entities designated by Owner, including, without limitation, any lender of Owner) shall be named as additional insured for the policies of insurance identified in **Schedule A**, to the extent possible. For the remaining policies placed by Owner under this Agreement (if any), the Owner's policies shall name the Operator as additional insured, to the extent possible. Evidence of insurance shall be provided upon request by Owner or Operator as the case may be with Owner and Operator each reserving the right to receive complete copies of all insurance policies maintained by the other party pursuant to this Agreement. Operator shall assist Owner in obtaining all insurance as required by this Agreement.

2.12    Litigation. All lawsuits initiated by or against the Hotel (whether Owner, Operator or both are named as parties) shall be administered in accordance with the provisions of this section.

(a) In connection with any suits or proceedings pertaining to the Hotel or any patrons thereof, only legal counsel designated by Owner shall be retained to represent the Owner as a party in any such suit.

(b) All suits or proceedings initiated by the Hotel shall be brought in the name of Owner and shall be handled in such manner as Owner directs. All legal expenses incurred in bringing such suits or proceedings shall be operating expenses and shall be paid out of the Operating Account, to the extent not covered by applicable insurance.

(c) Should any claims, demands, suits or other legal proceedings be made or instituted by any person against Owner which arises out of any of the matters relating to this Agreement, Operator

shall give Owner all pertinent information and reasonable assistance in the defense or other disposition thereof. All costs and expenses incident to such proceedings shall be paid from the Operating Account, except (i) to the extent covered by insurance or (ii) to the extent any uninsured claims are caused by the fraud, gross negligence or willful misconduct of the Operator, in which case, Operator shall indemnify Owner in accordance with Section 6.1 hereof.

(d) In the event Operator or any of their respective members, managers or officers  is a named party in any such suits or proceedings, then Operator, its partners, affiliates and consultants, shall be represented by legal counsel designated by Operator and shall be handled in such manner as Operator directs. All actual and reasonable legal expenses incurred incident to such suits or proceedings shall be operating expenses and shall be paid out of the Operating Account, to the extent not covered by applicable insurance, if such suits (i) are not related to the fraud, gross negligence or willful misconduct of Operator, or are a result of Operator's breach under this Agreement, and (ii) do not represent claims or counterclaims by Owner against Operator involving a breach of Operator's obligations under this Agreement.

2.13    Reservation and Credit Card System.  Operator shall implement customary charge card systems, such as American Express, Mastercard and Visa. Owner hereby authorizes Operator to accept all charge or credit cards designated by Operator for all Hotel charges authorized in accordance with Operator's credit card billing policies, as amended from time to time, subject to the right of Owner to designate or approve (i) the bank or financial institution selected to process credit card charges for the Hotel, and (ii) such other reasonable policies and/or procedures; provided under all circumstances such credit card acceptance policies shall comply with all Franchise Requirements. In addition, Operator shall use its best efforts to cause any franchisor providing a Franchise for the Hotel to provide for the Hotel and the guests thereof the full benefit and advantages of the existing inter-hotel reservation and credit card systems of the franchisor to the extent permitted under the applicable Franchise. Operator shall exercise commercially reasonable efforts to make available to the Hotel any pricing discounts extended to Operator in connection with the management of multiple hotel facilities, to the extent the Hotel is eligible for the same under the terms and conditions imposed by the credit card issuers or processors.

2.14    Negotiations with Retail Tenants and Concessionaires.  Operator shall have the right, but not the obligation, to negotiate with any concessionaires, licensees, tenants or lessees of any portion of the facilities of the Hotel on Owner's behalf, provided, however, that Operator shall not have the authority to enter into any such contracts or commitments, such authority being reserved to the Owner. The foregoing provisions shall not apply to use of Hotel facilities by guests, conferences and other activities within the ordinary course of operations of the Hotel and shall be subject to the Franchise Requirements.

2.15    Publicity.  The Parties shall coordinate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance by either of them of their respective obligations hereunder; provided, however, the foregoing shall not apply (i) in connection with any dispute under this Agreement, (ii) to any disclosures required by law or court order, and/or (iii) to any disclosures and/or statements to a party's consultants, advisors, accountants, attorneys, employees, representatives, lenders and/or any other persons or entities who a party deems reasonably necessary

for the purposes of performance under this Agreement and/or interpretation hereof.

2.16    Use of Affiliates by Operator.  In managing the Hotel, Operator may purchase goods, supplies and services from or through any of its affiliates so long as the prices and terms (including cost of freight and delivery) thereof are equal to or less than the prices and terms of goods and services of equal quality available from non-affiliates and provided that each such affiliate has been identified in writing in advance by Operator and has been approved by Owner.  Operator shall exercise commercially reasonable efforts to make available to the Hotel any pricing discounts or commissions extended to Operator, or any such affiliates, by vendors of goods or services, in connection with the management of multiple hotel facilities, to the extent the Hotel is eligible for the same under the terms and conditions imposed by the applicable vendor.

2.17    Furniture, Fixtures & Equipment.  Operator shall recommend, arrange, coordinate and purchase all replacement furniture, fixtures, wall coverings, floor coverings, window treatments, fixtures, hotel equipment and vehicles that constitute maintenance and repair or are Maintenance Cap Ex, subject to and in accordance with the Annual Business Plan and other applicable provisions of this Agreement.  All costs shall be included in the Annual Business Plan and paid through the Operating Account.  Owner shall be responsible for arranging, coordinating and purchasing all replacement furniture, fixtures, wall coverings, floor coverings, window treatments, fixtures, hotel equipment and vehicles that constitute Major Cap Ex, or are part of a Major Cap Ex program, all as more specifically provided in Section 2.7; provided, however, notwithstanding anything contained herein to the contrary, prior to the Opening Date, and as far in advance of the Opening Date as may be reasonably necessary, Operator shall consult with and advise Owner regarding the acquisition, placement and/or installation of all recommended and/or necessary furniture, fixtures and equipment in connection with the ownership and operation of the Hotel in a first class manner based on Operator's industry experience and/or the Franchise Requirements; provided however, that Operator shall not be responsible for the direct administration of the design, selection, pricing and procurement process for Hotel furniture, fixtures and equipment and shall act only in an advisory capacity to Owner in that process.

2.18    Supplies.  Operator shall recommend, arrange, coordinate and purchase all dishware, glassware, silverware, linens, soaps, toiletries and other operating supplies customarily required for the operation of the Hotel, all costs of which shall be included in the Annual Business Plan, and paid through the Operating Account.

2.19    Use.  Operator shall manage the Hotel only as a hotel facility (including food and beverage operations, if applicable) and for such other uses as may be necessary or incidental to such use and permitted by the Franchise, if any.  Operator shall use commercially reasonable efforts to ensure that no use shall be made or permitted to be made of the Hotel, and no acts shall be done, which shall cause the cancellation or materially increase the premium of any insurance policy covering the Hotel or any part thereof nor shall Operator sell or permit to be kept, used or sold in or about the Hotel any article which may be prohibited by law or fire underwriter's regulations.

2.20    Liens.  Operator shall neither suffer nor permit the Hotel to be used in such a manner as (a) might reasonably tend to impair Owner's title thereto or to any portion thereof, or (b) may reasonably make possible a claim or claims of adverse usage or adverse possession by the public, as

such, or of implied dedication of the Hotel or any portion thereof, subject to Owner's prior consent. Provided, however, that Operator's obligation to make any payments hereunder shall be limited to amounts provided for such purposes in the Annual Business Plan and any such payment shall be paid through the Operating Account.

      2.21   Designated Owner's Representative.  Owner shall designate a representative who shall be solely and exclusively responsible for all communication with Operator regarding the operation of the Hotel and the provision of all notifications to Owner, and obtaining of all consents and approvals required of the Owner, hereunder.  Owner may, from time to time, change the identity of its representative by providing at least ten (10) days' written notice to Operator.


## ARTICLE III

## OPERATING ACCOUNT

      3.1   Operating Account.  (a) Operator is authorized to establish one or more accounts (collectively the "**Operating Account**") at one or more financial institutions approved by Owner. Each such account shall be established by Operator as agent for Owner, and both Operator and Owner shall each designate authorized signatories to access such account.  Operator shall not commingle any of its funds with the funds of the Hotel.  Operator shall deposit all revenues collected from the operation of the Hotel and any funds advanced by Owner or Operator into the Operating Account.  Out of the Operating Account, Operator shall pay the operating expenses of the Hotel, any approved capital expenditures and any other payments relative to the Hotel as required by the terms of this Agreement.  On or before the 20th day following the end of the first full calendar quarter following commencement of the Term of this Agreement, and then each calendar quarter thereafter, Operator shall remit to Owner all unexpended funds in the Operating Account except for a reasonable working capital balance, as determined from time to time by agreement of the Operator and Owner, which shall remain in the Operating Account.  The minimum working capital balance shall initially be set at $150,000 and shall be subject to review and adjustment by agreement of Owner and Operator upon completion of the first operating year and each year thereafter. Owner may, at its sole option, at any time and from time to time, elect to increase the amount of this minimum working capital balance.  Upon the request of Operator, accompanied by a detailed explanation, Owner shall promptly deposit such additional working capital funds as shall be reasonably required for the proper and efficient operation of the Hotel.

      (b)  Operator shall establish a sub-account or accounts within the Operating Account designated the "**Capital Improvement Sub-Account**."  All funds set aside or deposited by Owner for purposes of implementing any Major Cap Ex with respect to which the Operator is providing management services under a separate agreement with the Owner, shall be deposited into the Capital Improvement Sub-Account and all costs of implementing the forgoing capital improvements shall be paid directly from the Capital Improvement Sub-Account.  In the event the terms and conditions of any financing by the Owner for the Hotel with a commercial bank or other financial institution requires the maintenance of separate capital or replacement reserves, then the terms and provisions of this section shall be subject to revision in order to make reasonable accommodation for any required reserves, which revision shall be subject to the approval of the Operator, which approval

shall not be unreasonably withheld, conditioned or delayed.

(c) Regardless of the balance of the Operating Account, payment of all expenses concerning the ownership of the Hotel shall, to the extent incurred by Operator within the scope of its authority under this Agreement, be the responsibility of Owner including, but not limited to, ad valorem taxes, property insurance, real property lease payments, or debt service pursuant to any mortgage or other security interest affecting the Hotel; provided however, Owner may authorize Operator to make such payments on its behalf. Operator's authority to draw against such accounts may only be terminated by Owner upon termination of this Agreement or as otherwise provided in this Agreement. In the event of such a termination, Owner shall assume and be responsible for all financial obligations of the Hotel which were incurred prior to said termination by Operator and which were incurred within the scope of the Operator's authority under this Agreement. The Owner shall be responsible for advancing such funds, if any, as may be necessary to fund the Operating Account on a timely basis to ensure continued, uninterrupted operation of the Hotel as provided in Section 3.3 hereof. The Operator shall have no obligation to advance any funds to the Operating Account. Operator shall use diligent care with respect to the proper accounting for all funds received and all funds received by Operator shall be properly deposited and applied in accordance with the terms of this Agreement.

3.2    Costs Eligible for Payment from Operating Account. Operator shall pay out of the Operating Account (a) all expenses provided for elsewhere in this Agreement to be paid out of the Operating Account and (b) all costs and expenses of maintaining, conducting and supervising the operation of the Hotel incurred by Operator or Owner directly or as otherwise provided herein which are attributable to the period in question and provided, in the case of any expenses or costs incurred by Operator, the same are in accordance with the Annual Business Plan or as permitted pursuant to the terms of this Agreement which costs and expenses include without limitation (but subject to the foregoing):

(a) The gross salary and wages, payroll taxes, insurance, worker's compensation and other compensation, benefits and associated expenses of employment of all persons employed or otherwise engaged by the Operator on site on a full-time, part-time or seasonal basis in connection with the Hotel;

(b) Cost of all utilities, including gas, oil, electric, sewer, water, telecommunications, television and any other utility services at the Hotel;

(c) The Base Management Fee payable to Operator hereunder;

(d) All property taxes, and other governmental or quasi-governmental assessments, fees, levies and other charges assessed against the Hotel, and all taxes, assessments and other charges payable by or assessed against Operator with respect solely to the operation of the Hotel (exclusive of any income, business profits or similar state or federal tax upon the Operator's management fees earned hereunder) unless paid directly by Owner

(e) The Franchise royalty and reservation/marketing fees payable periodically to the Franchisor under the Franchise for the Hotel and costs of reservation services and other services provided to the Hotel by the Franchisor, if applicable;

{N4257934.1}                                    {N4257934.1}                                    13

(f) All expenses for marketing, advertising and sales at or for the Hotel and all expenses of sales, promotions and public relations activities related to the Hotel;

(g) Costs of acquisition, leasing, maintenance, repair and replacement of all cash registers, computers, software, software licenses, printers, calculators and other furniture, fixtures and equipment used in the operation of the Hotel;

(h) All third party professional fees, charges and expenses related to the operations of the Hotel including, without limitation, attorneys, accountants, engineers, ergonomics, professionals, designers, planners and other professional services (but not any fees for the provision of off-site accounting and financial reporting services through Operator's central accounting facilities under this Agreement nor any fees, charges or expenses for any offsite employees of the Operator or any affiliate of the Operator);

(i) Costs of collection of delinquent revenues through a collection agency or any other means which has been approved in advance by Owner;

(j) Costs of electronic data processing charges for payroll and operations information systems;

(k) Reasonable travel expenses incurred by officers and employees of Operator for the direct benefit of the Hotel and properly allocated with other properties managed by Operator and which have first been approved by Owner through the Annual Business Plan approval process;

(l) Reasonable fees and travel expenses of consultants engaged by Operator for the benefit of the Hotel which have first been approved by Owner through the Annual Business Plan approval process;

(m) Insurance premiums and all other insurance or risk-related costs for insurance required or allowed under this Agreement, including without limitation, property insurance, general liability insurance, umbrella liability insurance, worker compensation insurance or insurance required in connection with employee benefits plans and such business interruption or other insurance as may be provided for protection against claims, liabilities and losses arising from the operation of the Hotel and losses incurred on any deductibles or risk retention programs including costs and expenses of insurance, health, safety and liability agents and consultants, and any participation in self insurance or risk retention groups approved by Owner;

(n) The costs of repairs to and maintenance of the Hotel in accordance with this Agreement;

(o) All mortgage, lease and other payments related to Hotel ownership as identified in the Annual Business Plan;

(p) Any reserve account established by Operator in accordance with sound financial management practices approved by Owner through the Annual Business Plan approval process; and

(q) The costs of all other goods and services obtained by Operator in connection with the operation of the Hotel including, without limitation, supplies and all services performed by third parties, provided such costs are not inconsistent with the specific terms of this Agreement and the Annual Business Plan as approved by Owner.

The foregoing enumeration of items included as operating expenses is subject to the overall limitation that such expense has been approved by Owner through approval of the Annual Business Plan or is otherwise authorized under any other specific provision of this Agreement.

The foregoing costs and expenses shall be incorporated to the fullest extent reasonably possible into the Annual Business Plan based upon the best information available at the time the Annual Business Plan is prepared. The Operator shall use commercially reasonable efforts to ensure that actual costs and expenses of operating the Hotel do not exceed the Annual Business Plan, provided that the Operator is not a guarantor of cost and expense levels.

    3.3    Insufficient Gross Income.  (a) After Operator has paid, to the extent of funds available in the Operating Account, all bills, charges, costs and expenses of operating and managing the Hotel as authorized hereunder, Operator shall submit to Owner the total of all remaining unpaid bills. Owner shall be obligated to advance to the Operating Account funds in an amount necessary to pay all such remaining unpaid bills (to the extent the same have been incurred by Operator in accordance with the Annual Business Plan or other applicable terms of this Agreement) within ten (10) calendar days after the receipt of written notice.

(b) Operator shall in no event be required to advance any of its funds for the operation of the Hotel, nor to incur any obligation to third parties in connection therewith unless Owner shall have furnished or agrees to furnish Operator with funds necessary for the discharge thereof. Operator is not required to perform any of its duties described in Article II or otherwise described in this Agreement until and unless sufficient funds to pay the costs of performance are available in the Operating Account, and notwithstanding any other provision of this Agreement, Operator's responsibilities hereunder shall be expressly subject to the foregoing condition.

In the event funds are insufficient to pay all amounts due at any level of priority, payment shall be made first to matters at that level most likely to give rise to liens and thereafter as Operator deems advisable. Payments shall be made according to the following levels:

| | |
|---|---|
| First: | to remittance of tax and other withholding mandated by law and to payment of payroll. |
| Second: | to payment of insurance premiums then due. |
| Third: | to payment of real estate taxes and other governmental impositions to avoid the accrual of penalties and liens. |
| Fourth: | to operating expenses accrued and payable. |
| Fifth: | to reserves and other payments. |

ARTICLE IV

COMPENSATION

4.1     Base Management Fee.  Owner shall reimburse Operator for all expenditures incurred by Operator as provided herein.  In addition, for the services provided by Operator hereunder, Operator shall receive a basic management fee equal to three percent (3.0%) of the Gross Revenue (as defined herein) derived from the operation of the Hotel  ("**Base Management Fee**").

Such compensation shall be paid on or before the 15th day of each month on the basis of Gross Revenue received during the preceding month. "**Gross Revenue**" as used herein shall include all revenue from the operation of the Hotel from all sources, including, without limiting the generality of the foregoing, all revenue derived from room rentals, operation of any and all restaurants, lounges, health clubs, spas, and other amenities or services sold at or in connection with the operation of the Hotel, excluding (a) telephone charges, (b) such amounts as Owner may receive and hold as security or in other special deposit so long as held, (c) amounts returned to payers as having been received by mistake or by reason of overcharges or discount or reimbursement, (d) funds received and held for the benefit of others, such as sales tax and gratuities, (e) insurance proceeds, excluding proceeds from business interruption insurance, (f) gains arising from the sale or other disposition of capital assets, including the sale of furniture, fixtures, and equipment; and (g) loans or capital infusions to the Hotel by Owner.

4.2     Termination Fee. Except as otherwise provided herein, including, without limitation, Section 5.1, Owner may not terminate this Agreement prior to the eighteen (18) month anniversary of the Opening Date of the Hotel (the "**18th Month Anniversary**").  In the event this Agreement is terminated

(a) by Owner during the period from the 18th Month Anniversary through the fifth anniversary of the Opening Date pursuant to:

(i) Section 5.1(c) hereof, or

(ii) Section 5.1(a)(ii) or (iii), to the extent insurance or condemnation proceeds are realized by Owner as a result of such events include management fees or termination fees related to such events, or

(iii) Section 5.1(a)(iv), in the event the cease and desist order results from any conduct, condition or other action by Owner or for which Owner is responsible; or

(b) by Operator pursuant to Section 5.2 hereof,

the Owner shall pay to the Operator a termination fee ("**Termination Fee**") equal to the greater of the amount of One Hundred and Fifty Thousand Dollars ($150,000) or the total of the Base Management Fee paid during the most recently completed trailing twelve (12) month period;

provided, however, if at the time of any termination as aforesaid, there are less than twelve (12) months remaining in the Term, the Termination Fee shall be an amount equal to the average monthly Base Management Fee paid during the most recently completed trailing twelve (12) month period multiplied by the number of months remaining in the Term.  In the event of a termination of this Agreement pursuant to Section 5.1(d), a Termination Fee may be due pursuant to the provisions of Section 5.1(d).  In the event of a termination of this Agreement pursuant to Section 5.1(e), the provisions of that Section shall control the payment of a Termination Fee or Sales Termination Fee (in lieu of a Termination Fee).  In the event of termination pursuant to any other Section of the Agreement, no termination fee, including, without limitation, any Termination Fee or Sales Termination Fee) shall be owed.  Notwithstanding anything contained herein to the contrary, there shall be no termination fees (including, without limitation, any Termination Fee or Sales Termination Fee) associated with any termination during a Renewal Term.

ARTICLE V

TERMINATION

5.1     Termination by Owner.

(a)     Owner may terminate this Agreement upon written notice to the Operator given at any time after the happening of any of the following events:

(i)     (A) Operator shall default in the payment of any amount required to be paid to Owner under this Agreement and such default continues for more than ten (10) days after Operator's receipt of written notice of such default from Owner, or (B) the occurrence of a material default by Operator in the performance or observance of any of the other terms and conditions of this Agreement or the obligations imposed upon Operator hereunder and shall fail to cure such default within thirty (30) days after receipt of written notice of such default from the Owner, or if such default cannot reasonably be cured within such thirty (30) day period, then Operator fails to promptly commence action to cure such default with all due diligence within such period and pursue the curative action to conclusion within a commercially reasonable period given the nature of the default and the availability of a means of curing the default (but in no event greater than ninety (90) days);

(ii)     The Hotel shall be partially or totally destroyed, or otherwise damaged by fire or other casualty such that it is uneconomical or otherwise infeasible to operate the Hotel and Owner shall not within sixty (60) days after such casualty, elect to rebuild or renovate the Hotel;

(iii)     The condemnation of the Hotel, or so much thereof as may make it uneconomical or otherwise infeasible to operate the Hotel;

(iv)     Operator or Owner shall be required by any authority having jurisdiction over the operation of the Hotel to cease and desist operating the Hotel and such requirement shall remain in effect for a period in excess of ninety (90) days.  Both Owner and Operator will use commercially reasonable efforts to terminate any such requirements; and

(v)      Operator shall be subject to a petition, voluntary or involuntary, under any present or future bankruptcy or insolvency law which, in the case of an involuntary petition, is not dismissed or discharged within ninety (90) days following the date of its filing or make an assignment of its assets for the benefit of its creditors (with the foregoing filings being considered a default hereunder by Operator).

Notwithstanding anything contained herein to the contrary, the Owner's right to terminate pursuant to this Section 5.1(a) may be exercised prior to the 18th Month Anniversary. In the event of a termination of this Agreement pursuant to Section 5.1(a)(i) or (v), Owner shall in no way be obligated to pay any Termination Fee or Sales Termination Fee and such termination right of Owner shall be in addition to any and all other rights and/or remedies of Owner hereunder, at law, in equity or otherwise to the extent such event constitutes a default hereunder and/or breach of this Agreement.      In the event of a termination of this Agreement pursuant to Section 5.1(a)(ii), (iii) or (iv), Termination Fee or Sales Termination Fee shall be payable only in accordance with the terms of Section 4.2 hereof.

(b)   Beginning upon the second (2nd) anniversary of the Opening Date and continuing upon the conclusion of each Fiscal Year thereafter (each of such dates being hereinafter referred to as a "**Performance Test Date**"), Owner shall have the right to terminate this Agreement upon thirty (30) days prior written notice and without payment of any Termination Fee, in the event that the Hotel fails to achieve any two of the performance benchmarks (the "**Performance Benchmarks**") set forth below during the preceding Fiscal Year (or, in the case of the initial Performance Test Date, the period beginning 12 months preceding such date and ending on the initial Performance Test Date, being hereinafter referred to as the "**Initial Year**"); provided that (i) a Force Majeure Delay has not occurred since the creation of the Annual Business Plan, (ii) Owner has provided sufficient working capital pursuant to the terms of this Agreement and (iii) Owner notifies Operator of its decision to exercise this right within one hundred twenty (120) days after receipt of the final Monthly Operating Report for the preceding Fiscal Year (or Initial Year, as applicable).      The right of Owner to terminate the Agreement on account of Operator's failure to achieve the Performance Benchmarks is separate and distinct from any remedy available to Owner on account of a default of Operator under the Agreement and the exercise of such right shall not constitute a waiver of any other right or remedy set forth in the Agreement, at law, in equity or otherwise. The Performance Benchmarks are as follows:

(i) Net operating profit for the Fiscal Year (or Initial Year, as applicable) shall equal at least ninety percent (90%) of the net operating profit contained in the approved Annual Business Plan for such Fiscal Year (or Initial Year, as applicable). The Operator at its option shall have the one-time right to cure a deficiency of in net operating profit by making a payment to the Owner in an amount that, when added to the actual net operating profit for such Fiscal Year (or Initial Year, as applicable), will equal ninety five percent (95%) or more of the net operating profit contained in the Annual Business Plan for such Fiscal Year (or Initial Year, as applicable).

(ii) A STR RevPAR Index test shall be negotiated in good faith and agreed upon by Operator and Owner (including, at Owner's election, any input from Owner's asset manager) as part of the annual approval process for each Annual Business Plan. "**STR RevPar Index**" means, with respect to any hotel property for any period, the revenue per available room index for such hotel property for such period as provided in the Smith Travel Research Report. When

agreeing upon this test for any upcoming Fiscal Year, the parties shall specifically consider the loss of available rooms during any scheduled Hotel renovation. Essentially, the test will measure the agreed-upon performance of the Hotel to that of the defined and agreed upon competitive set for the Fiscal Year under review. The parties agree and acknowledge that the composition of the competitive set shall also be reviewed at that time to insure that the STR RevPAR Index test best and most fairly represents the Hotel's performance compared with that of its most direct competitors, based on the market position of the Hotel.

(iii) A test of guest satisfaction scores ("**GSS**") shall be negotiated in good faith and agreed upon by Operator and Owner (including at Owner's election, any input from Owner's representative) as part of the annual approval process for each Annual Business Plan. The parties agree that, at a minimum, GSS shall satisfy such standard as set by Franchisor and shall be conducted in a manner consistent with the Franchisor's GSS protocols.

(c)    In addition to the foregoing, Owner may terminate this Agreement upon not less than thirty (30) days' notice, for any reason or without reason, at any time after the 18th Month Anniversary, but only upon payment of the Termination Fee described in Section 4.2 above, which termination shall only be effective upon payment in full of the Termination Fee.

(d)    Owner shall have the right to terminate this Agreement at any time after the date hereof due to the failure of the Hotel to commence commercial operations, for whatever reason. In the event of termination pursuant to this paragraph (d), Owner shall not enter into a hotel management agreement for the Hotel with a hotel manager other than the Operator for a period of twelve (12) months following the date of termination. In the event that Owner enters into a hotel management agreement for the Hotel with a hotel manager other than Operator within said 12-month period, Owner shall pay the Termination Fee to Operator unless (i) the failure of the Hotel to open is the result of a default by Operator or an affiliate of Operator under this or any other agreement with Owner or an affiliate of Owner in connection with the Hotel, or (ii) Hyatt Hotels Corporation rejects the Owner's application for a franchise for the Hotel.

(e)    Owner shall have the right to terminate this Agreement in the event of a sale, transfer or other disposition of the Hotel in a bona fide third-party transaction (whether before or after the 18th Month Anniversary). In the event of termination:

(i) prior to the 18th Month Anniversary, Owner shall pay to Operator the Termination Fee; and

(ii) following the 18th Month Anniversary, Owner shall pay to Operator a fee equal to future budgeted ninety (90) days Base Management Fee in the then current Operating Budget following the close of sale ("**Sales Termination Fee**").

5.2    Termination by Operator. Operator may, in its sole and absolute discretion, terminate this Agreement upon the occurrence of the following events:

(a)    Owner shall default in the payment of any amount required to be paid to the Operator, Operating Account or Capital Account and such default continues for more than ten (10) days after

receipt of written notice of such default from Operator to Owner; and

(b)      Owner shall default in the performance or observance of any of the other material terms and conditions of this Agreement or the material obligations imposed upon Owner hereunder and shall fail to cure such default within thirty (30) days after receipt of written notice of such default from Operator to Owner, or if such default cannot be cured within such thirty (30) day period, then Owner fails to promptly commence action to cure such default with all due diligence within such period and pursue the curative action to conclusion within a commercially reasonable period given the nature of the default and the availability of a means of curing the default.

5.3      Effect of Termination.  Upon termination of this Agreement pursuant to Sections 5.1 or 5.2, Operator shall have no further interest in the Hotel but shall be entitled to a final accounting of and payment of any sums due to Operator in accordance with the terms of this Agreement through the date of termination; provided, however, nothing contained in the foregoing shall in any way limit Operator's obligations under this Agreement that expressly, or by its nature, survive termination.

5.4      Post-Termination Obligations.  The Operator agrees that, upon termination of this Agreement, it will:

(a) cooperate fully with Owner to assist in an orderly transfer of the management and operation of the Hotel to a successor operator; and to the extent permitted by applicable law, Operator shall transfer all licenses and permits held in its name to such successor operator;

(b) deliver to Owner all financial information and all books and records maintained in connection with the Hotel promptly after termination;

(c) assign to Owner or its designees any and all contracts and leases relating to the Hotel entered into by Operator pursuant to this Agreement, with Owner or its designee agreeing to assume all of the obligations under such contracts and leases on and after the date of termination;

(d) transfer to Owner all Hotel records and documents, including but not limited to all sales records and information regarding future bookings, all applicable and available Hotel employee information not requiring a release from the employee, and, except in the case of a termination by Owner without cause, Operator agrees not to employ the Hotel's general manager for a period of twelve (12) months nor any other Hotel employee for a period of six (6) months following termination of this Agreement;

(e) transfer to Owner or its designee all cash and cash equivalents from the operation of the Hotel, including house banks, petty cash and Operating Account balances, with a final accounting for the transferred balances from the last financial reports delivered to Owner.

5.5      Survival.  No expiration or termination of this Agreement shall cancel or void any section of this Agreement which, by its nature, extends beyond such expiration or termination, nor shall such expiration or termination operate to release either party from any obligation or liability which has accrued to such party prior to such expiration or termination.

5.6     Indemnity Upon Termination.   From and after the date of termination of this Agreement for any reason, Owner shall assume, pay and hold Operator, and their respective members, managers and officers harmless from all employee, payroll and employment-related obligations and liabilities associated with the work force employed by Operator at the Hotel pursuant to this Agreement and not in violation of this Agreement and incurred by Operator in accordance with the Operating Budget, and all obligations and liabilities under contracts with third parties then existing with respect to the Hotel which Operator may have entered into pursuant to this Agreement and not in violation of this Agreement.

## ARTICLE VI

## INDEMNIFICATION

6.1     Operator Indemnity.   Operator shall indemnify and hold Owner (and Owner's affiliates, agents, principals, shareholders, partners, members, managers, officers, directors and employees) harmless from and against all liabilities, losses, claims, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) that may be incurred by or asserted against any such party and that arise from (a) the fraud, willful misconduct or  gross negligence of the general manager or any management or other employees of Operator, (b) the breach by Operator of any material provision of this Agreement, or (c) any action taken by Operator which is beyond the scope of Operator's authority under this Agreement.   Owner shall promptly provide Operator with written notice of any claim or suit brought against it by a third party which might result in such indemnification, and Operator may, with the consent of Owner, defend any claim or suit brought against Owner with counsel selected by Operator and reasonably satisfactory to Owner.   Owner shall cooperate with Operator or its counsel in the preparation and conduct of any defense to any such claim or suit.

6.2     Owner Indemnity.   Owner shall indemnify and hold Operator (and Operator's affiliates, agents, principals, shareholders, partners, members, officers, directors and employees) harmless from and against all liabilities, losses, claims, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) that may be incurred by or asserted against such party by any third party and that arise from or in connection with (a) the performance of Operator's services under this Agreement within the scope of its authority, or (b) claims of third parties for damage to property or injury or death to persons arising out of any fraud, willful misconduct or gross negligence of Owner, or (c) the breach by the Owner of any material provision of this Agreement.   Operator shall promptly provide Owner with written notice of any claim or suit brought against it by a third party which might result in such indemnification and Owner may, with the consent of the Operator, defend any claim or suit brought against Operator with counsel selected by Owner and reasonably satisfactory to Operator.   Operator shall cooperate with Owner or its counsel in the preparation and conduct of any defense to any such claim or suit.

6.3     Survival.   The provisions of this Article shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term.

## ARTICLE VII

{N4257934.1}                              {N4257934.1}                                      21

## MISCELLANEOUS

7.1     Notices.  Any and all notices, demands, consents, approvals, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given if in writing and the same shall be delivered either in hand, or by mail or Federal Express or similar nationally recognized expedited commercial carrier, addressed to the recipient of the notice, postpaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).  All notices required or permitted to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of acknowledged receipt, upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.  All such notices shall be addressed,

If to Owner:                 River Eagle Hotels LLC
                             C/O Beitler Hotels LLC
                             980 North Michigan Avenue, Suite 1225
                             Chicago, Illinois 60611
                             Attn:  John Paul Beitler III

                             and

                             River Eagle Hotels LLC
                             C/O River Eagle Investments, L.L.C.
                             2018 13th Street
                             Silvis, Illinois 61282

With a copy to:              Thompson Coburn LLP
                             55 East Monroe Street, 37th Floor
                             Chicago, Illinois 60603
                             Attn:  James Oakley, Esq.

If to Olympia:

                             Olympia Hotel Management LLC
                             7 Custom House Street, 5th Floor
                             P.O. Box 508
                             Portland, Maine  04112-0508
                             Attn:  Kevin Mahaney
                             Facsimile:  207-874-9993

With a copy to:

                             Pierce Atwood LLP
                             Merrill's Wharf
                             254 Commercial Street
                             Portland, Maine  04101

(M4257934.1)                      (M4257934.1)                              22

Attn:  Christopher E. Howard, Esq.
e-mail:  choward@pierceatwood.com


7.2     Survival.  Except as otherwise expressly provided herein, obligations accrued to the date of any termination of this Agreement shall survive the termination.

7.3     Governing Law; Venue.  The laws of the State of Illinois shall govern the validity, enforcement and interpretation of this Agreement unless otherwise provided herein or agreed to by Owner and Operator.

7.4     Integration; Modification; Waiver.  This Agreement and the exhibits or annexes referred to herein and attached hereto constitute the complete and final expression of the agreement of the parties relating to the Hotel and supersede all previous contracts, agreements and understandings of the parties, either oral or written, relating to the Hotel. This Agreement cannot be modified, or any of the terms hereof waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

7.5     Counterpart Execution.  This Agreement may be executed in several counterparts, and with facsimile (or PDF or similar) signatures, each of which shall be fully effective as an original and all of which together shall constitute one and the same instrument.

7.6     Headings; Construction.  The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement. Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday under Illinois law, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

7.7     Agent Only for Owner.  It is agreed that in carrying out its obligations hereunder for its fees, Operator is acting solely as agent for and on behalf of and for the account of the Owner, and that nothing in this Agreement shall create or be construed to create a partnership relationship or joint venture relationship between the Owner, its successors and assigns, on the one part, and Operator, its successors and assigns, on the other part (solely by reason of, or with respect to, the subject matter of this Agreement), but rather only the relationship of principal and agent; or to require Operator to bear any portion of losses (by, through or under this Agreement) arising out of or connected with the ownership or operation of the Hotel except as otherwise specifically set forth herein.

Operator shall not be responsible to the Owner for any of its actions or inactions or the effects thereof which are the direct or indirect result of any controls or requirements imposed by any

government, governmental agency or regulatory body which may have jurisdiction or control over Operator directly or indirectly arising from any provision of this Agreement; provided, however, that nothing relieves Operator herein if its acts or omissions caused such governmental action.

    7.8    Invalid Provisions.  If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications for any such provision shall not be affected thereby.

    7.9    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of Owner and Operator and their respective successors and permitted assigns. Except as expressly provided herein, nothing in this Agreement is intended to confer on any person, other than the parties hereto and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

    7.10    Complimentary Rooms.  Owner may, subject to availability, grant complimentary rooms to the owners, direct or indirect, and personnel (and their family members) of Owner, Operator and Franchisor to the extent rooms are available, and otherwise in accordance with reasonable and customary policies employed within the first class travel industry, or as required by the Franchise for the Hotel.

    7.11    Collateral Assignment and Subordination.  Operator agrees to enter consents, subordination agreements and other agreements required by financial institutions and other lenders (not affiliated with Owner unless there is a customary subordination and non-disturbance agreement in place as to any such affiliated lenders) which, from time to time, provide any financing related to or secured by the Hotel allowing collateral assignment of this Agreement and subordination of Operator's rights hereunder to any mortgage or deed of trust financing for the Hotel and containing such other terms as such lender customarily requires.

    7.12    Force Majeure Delay.  A Force Majeure Delay shall mean delays in the performance of any act under this Agreement proximately caused by (i) fire, storm, lightning, flood, earthquake, surface or subsurface water, mob violence, terrorism, vandalism or casualty beyond the control of Owner or Operator, (ii) strikes, boycotts or lockouts; (iii) the unforeseen refusal of any governmental authority to issue any permits, licenses, entitlements or approvals so long as Owner shall have diligently sought, and shall diligently continue to seek to obtain, such permits, licenses, entitlements or approvals; (iv) condemnation or threat of condemnation; (v) any injunctive or restraining order or other judicial proceeding; (vi) the unforeseen inability to obtain materials and supplies (or suitable substitutes therefor) necessary for the repair, restoration, construction or reconstruction of the Hotel at reasonable prices, so long as Owner or Operator shall have diligently sought, and shall diligently continue to seek to obtain, such materials and supplies.  The party whose performance is affected shall give the other party written notice of any Force Majeure Delay within five (5) business days after actual knowledge of the beginning of each such delay and shall provide a written status report, which shall state whether the Force Majeure Delay has terminated, every two (2) weeks thereafter during the period of the delay.

7.13    Assignment of Agreement. (a)   Operator may not assign its rights under this Agreement without the prior written consent of the Owner, which consent may be withheld in Owner's sole and absolute discretion.  Owner may, without Operator's consent, assign its rights hereunder to (i) the holder of any mortgage or deed of trust covering the Hotel, as security therefor, (ii) any purchaser, lessee or other transferee of substantially all of the assets comprising the Hotel, provided such purchaser, lessee or transferee expressly assumes in writing the obligations of Owner hereunder first arising subsequent to the date of the assignment, and/or (iii) any entity and/or person affiliated with Owner, including, without limitation, any person or entity which directly or indirectly controls, is directly or indirectly controlled by or is under common control with Owner, or to any entity resulting from a merger or consolidation with Owner or to which Owner is a party.  Further, notwithstanding anything contained herein to the contrary, a transfer or reorganization of any owner ownership interests of Owner shall not be deemed an assignment or otherwise require the consent of Operator.  Upon any transfer and assumption of this Agreement (whether with or without consent as may be provided for herein), Owner named herein (and any subsequent owner who has accepted such an assignment) shall be relieved of all liability hereunder accruing after the effective date of such assignment.

(b) Operator may, but only with Owner's consent, assign its rights hereunder to any party acquiring Operator's business, whether by means of (i) merger, consolidation, reorganization, or (ii) purchase of all or substantially all of Operator's assets as a going concern and upon such assignment Operator shall be relieved of all liability hereunder accruing after the effective date of such assignment.  Nothing set forth herein shall limit or restrict the assignment of Operator's rights under this Agreement to any entity owned or controlled, directly or indirectly, by The Olympia Companies, or Kevin P. Mahaney.

7.14    Prevailing Party.  In the event of a dispute between the parties hereto with respect to the enforcement of either party's obligations contained herein, and/or in connection with a breach of and/or default under this Agreement, the prevailing party shall be entitled to reimbursement of reasonable attorney's fees, costs, and expenses incurred in connection therewith.

[Remainder of Page Intentionally Left Blank – Signature Page Follows]

OWNER:

RIVER EAGLE HOTELS LLC

By:  River Eagle Investments, L.L.C.,
Member

By: _____
Its Duly Authorized Officer

OPERATOR:

OLYMPIA HOTEL MANAGEMENT, LLC

By:  OEI Management Corp., Its Operator

By: _____
Its Duly Authorized Officer

<u>Schedule A</u>

**Insurance Coverage Requirements**

**Owner Insurance Requirements**
*Property:*
- coverage to be replacement value including FF&E.

*Business Income:*
- 12 months loss of rent
- Coverage for earthquake, flood, wind and named wind storms to be determined by Owner
- Deductibles - $25,000 except for water damage, wind and hail which would be $50,000. Deductibles Named wind storms to be determined.

*Automobile Coverage:*
- All Operator-owned vehicles and all hired and non-owned vehicles used in provision of services
- $1,000,000 combined single limit, with a $1,000 deductible.
- Owner named as additional insured on a primary/non-contributory basis

*Auto:*
- For valet, garage keepers. $350,000 per location.

**Operator Insurance Coverage**

*General Liability:*
- Owner named as Additional Insured on a Primary/Non-Contributory Basis
- $2,000,000 general aggregate
- $2,000,000 each occurrence
- Employee Benefits Liability - $1,000,000 each common cause, $2,000,000 aggregate
- $5,000 Medical Expenses
- Deductible - None
- Liquor Liability - $1,000,000 each common cause, $2,000,000 aggregate. No Deductible.
- No exclusion for Child Molestation.

*Workers Comp:*
- Statutory coverage and limits
- Employers liability limits - $1,000,000 per occurrence for Bodily Injury, $1,000,000 per disease
- Policy shall include the following endorsements:
    - waiver of subrogation in favor of Owner, to the extent available

- Owner named on an alternate employer endorsement
- Waiver of Illinois "Kotecki" cap
- US Longshore & Harborworkers Act endorsement, to the extent applicable

*Crime:*

Coverage limits
- $250,000 - employee theft, with a $1,000 deductible
- $ 50,000 - forgery, robbery, theft of money inside and outside premises
- $  3,000 - guest property inside the premises
- $100,000 - guest property in safe deposit boxes.

Deductibles:
- $1,000 employee theft, forgery, theft of money, robbery.
- None for guest property
- Owner coverage to name Owner as loss payee

*Employment Practices Liability:*

- $3,000,000 limit of liability
- Deductible – initially, $50,000; however, to be annually agreed upon by Owner and Operator based upon commercially available deductible levels
- If claims made coverage, then effective date is retroactive prior to inception of Operator's commencement of services
- Coverage to continue for 2 years following termination of Agreement

*Umbrella:*

- $18,000,000 each occurrence. $18,000,000 aggregate. $10,000 retention. Coverage for child molestation not included.