UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| OLYMPIA HOTEL MANAGEMENT, LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>  v.<br><br>THE BEND HOTEL DEVELOPMENT COMPANY, LLC, an Illinois limited liability company,<br><br>        Defendant. | **Civil Action No. 2:20-cv-136-NT** |

## OLYMPIA'S OPPOSITION TO THE BEND'S MOTION TO DISMISS OR OTHERWISE TRANSFER

The Bend[1] reached into Maine with a cold call to Olympia and subsequently negotiated a multi-year contract for Olympia to utilize its specialized expertise to manage and operate The Bend's hotel. The Bend knowingly and eagerly received a broad array of services for its hotel from over a dozen Olympia personnel, who provided the hotel's accounting, budgeting, human resources, and marketing from Maine, among many other services. The Bend's representatives personally directed numerous phone calls and emails into Maine (some of which are attached to this brief) in furtherance of this long-term working relationship. Ultimately, The Bend breached its contract with Olympia and refuses to pay Olympia the $300,000 Bend owes. Now The Bend claims that, despite negotiating and signing a detailed contract under which it both received substantial and ongoing services from Maine and promised to pay for those services, it is not

---

[1] Capitalized terms have the same definitions as in Defendant's Motion to Dismiss (ECF Doc. 12).

subject to jurisdiction in this state.  The Court should reject this effort to derail this lawsuit and should allow Olympia to seek redress in its home forum for breach of a contract that Olympia performed in Maine.

### I.    Factual Background Relevant to Personal Jurisdiction.

From its office in Portland, Maine, Olympia provides a suite of hotel management services to hotels around the country.  Declaration of Sara Masterson ("Masterson Decl.") ¶ 3. Olympia's business model is to provide hotel owners and developers with the deep pool of expertise in hotel management that its personnel in Maine have developed.  *Id*. ¶ 4.

In 2013, Olympia received a cold call from J. Paul Beitler, who identified himself as an agent for Great River, an entity seeking to develop a Hyatt-branded hotel on a site in East Moline, Illinois.[2]  Declaration of Christine Chapin ("Chapin Decl.") ¶¶ 4-5.  Mr. Beitler informed Olympia that he was calling at the recommendation of Hyatt, who suggested Olympia as a potential manager of the to-be-developed hotel.  *Id*. ¶ 5.  Prior to Mr. Beitler's call, Olympia had no relationship with Great River or its principals, nor had even heard of this hotel project. *Id*. ¶ 6.  Olympia then spent several months negotiating an agreement under which it would provide management and operational services for the East Moline hotel.  Declaration of John Schultzel ("Schultzel Decl.") ¶¶ 3-7.  During these negotiations, Great River's agents sent emails

---

[2] VanDeHeede's Declaration carefully omits how the relationship between Olympia and Great River (The Bend's predecessor, *see infra* n.4) was initiated.  VanDeHeede states that "Great River began negotiating with Olympia," without identifying the cold call from Mr. Beitler, Great River's agent, that initiated those negotiations.  *See* VanDeHeede Decl. ¶ 15.  In any event, VanDeHeede was not serving as Great River's agent when the HMAs were negotiated and executed, and thus lacks personal knowledge of these portions of his affidavit.  Moreover, he could not have participated in any events surrounding the negotiation or execution of the HMAs after February 11, 2014, because he was convicted of federal tax fraud in 2013 and was imprisoned between February 11, 2014 and December 24, 2014.  *See* Case No. 4:12-cr-40084-SLD-JAG (C.D. Ill.), Jan. 23, 2014 Minute Entry and ECF Doc. 24.

2

to Olympia in Maine, including proposed versions of the agreements.  Schultzel Decl. ¶¶ 6-7; Schultzel Exh. A.  Ultimately, in May 2014, the parties executed two Hotel Management Agreements (the "HMAs"), one for the extended stay hotel and one for the "select service" hotel, which occupy the same physical footprint in East Moline (collectively, the "Hotel").[3]  ECF Doc. 1-2.  The HMAs were executed remotely by each party, with Olympia's representative signing electronically.  Schultzel Decl. ¶ 9; *see also* ECF Doc 1-2 at 29.[4]

The HMAs had a five-year term running from the opening of the Hotel.  ECF Doc. 1-2 at 4.  The HMAs initially contemplated the Hotel would open by August 2015, but after the opening was delayed, the HMAs were amended in 2017 to reflect the five-year term running from an opening date of December 2018.[5]  ECF Doc. 1-3 at 1.  Each HMA required The Bend to maintain a minimum working capital balance of $150,000 in each operating account (for a total of $300,000 in minimum working capital for the Hotel).  ECF Doc. 1-2 at 15.  The HMAs (as amended) provided that failure by The Bend to maintain this minimum working capital balance entitled Olympia, after a ten-day cure period, to terminate the HMAs.  ECF Doc. 1-3 at 2.  Such termination entitled Olympia to a Termination Fee of $150,000 per operating account if the termination occurred in the second year after the Hotel opened.  *Id.*

In mid-2018, Olympia began to perform under the HMAs in preparation for the December 2018 opening of the Hotel.  Olympia continued to perform under the HMAs until their termination in April 2020.  Masterson Decl. ¶ 6.  Pursuant to the HMAs, Olympia performed a

---

[3] The HMAs are substantively identical for purposes of this motion.  The HMAs were executed on the owners' behalf by River Eagle Hotels LLC, which later formally changed its name to Great River.  VanDeHeede Decl. (ECF Doc. 13) ¶ 7.

[4] Pincites to ECF documents refer to the "Page X of Y" numbers that the ECF system generates upon the document's filing.

[5] This 2017 amendment also assigned the HMAs from Great River to The Bend.  ECF Doc. 1-3 at 1.

broad array of management and operational services from Maine for The Bend.  Under the

HMAs, and from its offices in Maine, Olympia:

- Placed and managed the Hotel's insurance policies, including its workers' compensation, general business liability, and certain other insurance policies, which was handled by Olympia CFO Daniel Flaherty in Maine.  Declaration of Daniel J. Flaherty ("Flaherty Decl.") ¶ 14; Compl. ¶ 21.

- Reviewed the Hotel's month-end and annual accounting reconciliations, monitored its cash flow, opened the Hotel's bank accounts and managed signature cards for these accounts, and processed checks for the Hotel's accounts payable, all of which was handled by Nicole Snyder, Olympia's Accounting Manager, from Maine.  Flaherty Decl. ¶ 16; Compl. ¶ 20.

- Oversaw and managed the Hotel's third-party payroll provider and oversaw benefits for all Hotel employees, including their medical, dental, life, and long-term disability insurance, as well as their retirement accounts, all of which was handled by Amy Farrell, Payroll and Benefits Manager, from Maine.  Flaherty Decl. ¶ 17; Compl. ¶ 20.

- On a daily basis, posted revenue and accounting activity for the Hotel, engaged in daily reconciliation of the Hotel's operating accounts, reviewed and posted invoices to the Hotel's accounts payable, filed the Hotel's monthly sales tax returns, completed reconciliations for the Hotel's month-end financial statements, and engaged in the Hotel's year-end accounting, all of which was handled by Olympia Accountant Andrea Nash from Maine.  Flaherty Decl. ¶ 18; Compl. ¶ 20.

- Managed the budget software used by the Hotel, set up sales tax accounts for the Hotel and managed the Hotel's sales tax reporting and payment processes, and set up the credit card merchant accounts used by the Hotel, all of which was handled by Olympia's Manager of Budgeting and Reporting Mike Clark from Maine (until February 2020, when he left Olympia).  Flaherty Decl. ¶ 19.

- Supervised from Maine the third-party IT consultant that managed the Hotel's IT initiatives, repairs, and troubleshooting.  Flaherty Decl. ¶ 20; Compl. ¶ 23.

- Directed the Hotel's on-site General Manager and provided ongoing support and direction in key areas of hotel operation and performance, which was handled from Maine, initially by John Schultzel, and after June 2019 by Rick Martin, Director of Operations.  Schultzel Decl. ¶ 15; Declaration of Richard Martin ("Martin Decl.") ¶ 3; Compl. ¶ 21.

- Handled employee relations, training, and claims management for the Hotel, which was handled by Michelle Pritchard and Alison Briggs from Maine.  Schultzel Decl. ¶ 19.

- Assisted in developing the Hotel's food and beverage programs, including development of the menus for the Hotel's food and beverage outlets, and performed initial training of food and beverage personnel, which was handled by Jason Cotton, Regional Director of

Operations, from Maine.  Schultzel Decl. ¶ 20.

- Negotiated the Hotel's larger contracts, including for cleaning supplies, food and beverages, and guest supplies, which was handled by Greg MacLean, Director of Operations, from Maine.  Schultzel Decl. ¶ 21.

- Managed the Hotel's sales and marketing, including account solicitation, prospecting potential clients, development of the Hotel's logo, periodic promotion of its food and beverage program, and other public relations, which was handled by Amanda Theberge, Marketing Manager, and Christine Chapin, Senior Director of Sales, from Maine.  Schultzel Decl. ¶ 23; Chapin Decl. ¶¶ 8-9; Compl. ¶ 22.

- Assisted the on-site General Manager with setting the Hotel's rate structure, which was handled by Lori McNaught, Director of Revenue Management, from Maine.  Schultzel Decl. ¶ 23.

- Provided training to the on-site Chief Engineer and provided expertise and tools to assist the Chief Engineer with day-to-day maintenance tasks, which was handled by Director of Facilities Don Hopkins from Maine.  Schultzel Decl. ¶ 24.

- Provided high-level reports and feedback to The Bend on the Hotel's operations, including reports on the conduct of The Bend's representative Mr. VanDeHeede, which was handled by Olympia President Sara Masterson.  Masterson Decl. ¶¶ 7-8; Masterson Decl. Exh. A.

- Directed the development of the 2020 operating budget for the Hotel with the on-site General Manager.  Martin Decl. ¶ 6.

- Assisted the on-site General Manager with preparation of the 2020 Sales & Marketing Plan for the Hotel.  Martin Decl. ¶ 7.

Olympia personnel in Maine communicated frequently with Mike VanDeHeede, The Bend's representative, with respect to these efforts.  Martin Decl. ¶ 4; Flaherty Decl. ¶ 7; Schultzel Decl. ¶ 16.  Mr. VanDeHeede contacted Olympia personnel in Maine to, for example, discuss the rates the Hotel offered (Martin Decl. ¶ 4); request information about the Hotel's finances (Flaherty Decl. Ex. C); request payments from the Hotel's operating accounts (Flaherty Decl. Exh. B); and make other instructions about the operating accounts (Flaherty Decl. Exh. A). Though there could be no doubt that Olympia and its personnel were located in Maine, Mr. VanDeHeede explicitly conveyed that he understood that Olympia and its personnel were located

5

in Maine, as he complained to Olympia Director of Operations Richard Martin about the cost of flying between Portland, Maine and Quad City International Airport and suggested that Mr. Martin fly to Chicago instead.  Martin Decl. ¶ 5.

Unfortunately, the Hotel suffered from chronic shortfalls in its operating accounts. Flaherty Decl. ¶ 6.   Managing the Hotel's cash flow became a topic of ongoing attention from Olympia personnel in Maine.  *Id*.   Olympia finally terminated the HMAs in April 2020. Masterson Decl. ¶ 6.  The Bend refused to pay Olympia the $300,000 in Termination Fees to which Olympia is entitled under the HMAs, and this lawsuit followed.

## II.   The Bend easily meets the due process test for the exercise of personal jurisdiction over it in Maine.

The Bend's contacts with Maine easily satisfy the Constitutional due process test for the exercise of jurisdiction by this Court.  The Bend's contacts with Maine relate to this case; The Bend voluntarily established a relationship with Olympia in Maine; it was foreseeable that The Bend would be sued in Maine; and exercise of jurisdiction in Maine is eminently reasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

### a.   Standard of Review

In diversity jurisdiction cases, the exercise of personal jurisdiction must be both authorized by state statute and permitted by the Constitution.  *See, e.g., LP Sols. LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018).  Maine's long arm statute, to provide "maximum protection to citizens of this State," reaches "to the fullest extent permitted by the due process clause of the United States Constitution."  14 M.R.S. § 704-A(1).  Thus the Court need decide only whether the exercise of jurisdiction over The Bend comports with Constitutional due process.

Where, as here, neither party seeks an evidentiary hearing, the Court reviews the motion to dismiss under the "prima facie" standard. *O'Hara Corp. v. AutoNav Marine Sys., Inc.*, No. 2:19-CV-00467-NT, 2020 WL 2770679, at *3 (D. Me. May 27, 2020). Under this approach, the Court takes "the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). "In reviewing the facts, [the Court] take[s] the plaintiff's evidentiary proffers as true and construe[s] them in the light most favorable to the plaintiff's claim, and [it] also consider[s] uncontradicted facts proffered by the defendant." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014).

### b.  Applicable Legal Standard

Olympia contends only that The Bend is subject to specific jurisdiction in Maine, so the Court need not address general jurisdiction. "Specific jurisdiction allows a court to hear a particular case as long as that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." *Baskin-Robbins*, 825 F.3d at 35 (internal quotation omitted). Olympia "must show that (1) its claim directly arises out of or relates to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable." *LP Sols.,* 907 F.3d at 102. In conducting this inquiry, "the Court must look at the prior negotiations of the parties, the contemplated future consequences of the contract, the terms of the contract, and the parties' actual course of dealing to determine whether there are minimum contacts sufficient to satisfy

due process." *BlueTarp Fin., Inc. v. Melloul Blamey Constr. S.C., Ltd.*, 846 F. Supp. 2d 307, 315–16 (D. Me. 2012) (citing *Burger King*, 471 U.S. at 479).

> **c.  The claims against The Bend relate to its contacts with Maine because they arise from The Bend's contracts with Olympia.**

"Relatedness requires that the action directly arise out of the specific contacts between the defendant and the forum state." *Baskin-Robbins*, 825 F.3d at 35 (internal quotation omitted). "This requirement serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contact with the forum." *Id.* The relatedness inquiry is subject to "a flexible, relaxed standard." *Id.* (*quoting Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994)). "Inferences can be drawn from the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *BlueTarp Fin., Inc. v. Matrix Const. Co.*, 709 F.3d 72, 80 (1st Cir. 2013) (internal quotation omitted).

Olympia claims The Bend breached the HMAs by failing to pay the required Termination Fees. Compl. ¶¶ 28-35. The Bend had extensive and ongoing contacts with Maine relating to the HMAs through its extensive and ongoing work with Olympia on the operations of the Hotel. "Because the very document that represents [The Bend's] forum-related activity is itself the cause and object of the lawsuit, this activity comprises the source and substance of, and is thus related to, [Olympia's] squabble with [The Bend]." *Pritzker*, 42 F.3d at 61. Put another way, The Bend's contacts with Maine "were related to the formation, performance, and breach of [Olympia's] contract with [The Bend] that is the subject of this suit." *BlueTarp*, 846 F. Supp. 2d at 316 (D. Me. 2012) (relatedness requirement satisfied).[6]

---

[6] The Bend argues that the relatedness element is not satisfied by pointing to the connections between this lawsuit and Illinois. *See* ECF Doc. 12 at 10-11. This is beside the point—the

Consider the First Circuit's decision in *BlueTarp v. Matrix,* where the "ramifications [of the contractual relationship] would be bills issuing from Maine, employees in Maine keeping track of Matrix's purchases and balance, Maine employees making decisions regarding credit adjustments and limits, and Matrix communicating with those employees to address any issues that arose."  709 F.3d at 80.  Here, as in *BlueTarp*, "the resulting relationship contemplated the future consequences of [Defendant] continuing to interact with [Olympia] in Maine," linking the cause of action to defendant's Maine contacts and satisfying the relatedness requirement.  *Id*.  Pursuant to the HMAs, The Bend received a wide-ranging set of services from Olympia in Maine.  Under the HMAs, The Bend frequently contacted Olympia in Maine regarding the Hotel's operations and finances.  Because this suit results from a breach of the HMAs, the claims are plainly related to The Bend's contacts under the HMAs with Maine.

The fact the claims relate to the HMAs—the very subject of The Bend's contacts with Maine—alone satisfies the relatedness requirement.  Nevertheless, The Bend is correct that a further "consideration in a contract action such as this is whether the defendant's forum-based activity was instrumental in the contract's formation or breach."  *BlueTarp,* 709 F.3d at 80.  The Bend is incorrect, however, that formation and breach are unrelated to Maine in this case.  As for formation, VanDeHeede implies that John Schultzel of Olympia traveled to Illinois to sign the HMAs,[7] but this is plainly incorrect: as the Court can see from the HMAs themselves, the HMAs

_____

relatedness inquiry does not consider whether plaintiff could or should have brought suit in a different forum.  The question is only whether the defendant's contacts with this particular forum are related to the claims against it.

[7] VanDeHeede states that "Schultzel traveled to Chicago for the signing of the HMAs."  ECF Doc. 13, ¶ 15.  As noted *supra* n.2, VanDeHeede could not possibly have personal knowledge of these purported facts.  In any event, if VanDeHeede is implying that Schultzel traveled to Illinois not to sign the HMAs himself, but instead for some sort of signing ceremony, he is incorrect, as the HMAs were signed remotely; regardless, a trip by Schultzel in which he did not sign the contracts would be only marginally relevant to contract formation.

9

were executed on Olympia's behalf by Kevin Mahaney, and were executed electronically (i.e., remotely) by each party in its respective location. *See* ECF Doc. 1-2 at 29; Schultzel Decl. ¶ 9. In any event, Great River's transmission of its drafts of the HMAs to Olympia in Maine serve as formation-related contacts. Schultzel Decl. ¶¶ 6-7; Schultzel Exh. A; *see also LP Sols., LLC v. Duchossois*, No. 2:18-CV-25-DBH, 2018 WL 1768037, at *6 (D. Me. Apr. 11, 2018). And importantly, the parties' relationship began when Great River's agent cold-called Olympia in 2013 to retain Olympia as a manager of the Hotel. Chapin Decl. ¶¶ 4, 6. Thus the formation of the parties' relationship is plainly related to The Bend's contacts with the forum. And breach is also related to Maine: The Bend breached by failing to pay the Termination Fee, which payment was due to Olympia in Maine. *See LP Sols.*, 2018 WL 1768037, at *7 ("The plaintiff asserts that the defendants breached the contracts by failing to make payments due to it in Maine and that this failure is a Maine contact. I agree.").

> **d. The Bend purposefully availed itself of this forum by entering into a long-term contract to receive substantial and ongoing services from Maine.**

The test for purposeful availment requires that "the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts.'" *LP Sols.*, 907 F.3d at 103 (*quoting U.S. v. Swiss Am. Bank*, 274 F.3d 610, 624 (1st Cir. 2001)). Both the voluntariness prong and foreseeability prong are satisfied by The Bend having reached into Maine to form the HMAs and receiving a broad spectrum of services from Maine.

> **i. The Bend voluntarily reached into Maine to contract with Olympia.**

"Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant himself.'" *Adams v. Adams*, 601 F.3d 1, 6 (1st Cir. 2010)

(*quoting Burger King,* 471 U.S. at 475).   In other words, the "defendant's contacts with the forum state must be voluntary—that is, not based on the unilateral actions of another party or a third person." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996).  "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 476 n.18.

Voluntariness is easily shown here: The Bend cold-called Olympia in Maine.  Chapin Decl. ¶¶ 4, 6.  The Bend did not, for instance, hire Olympia to manage its hotel when Olympia was located in Illinois, only to have Olympia later relocate to Maine.  Instead, The Bend voluntarily reached into Maine and established a relationship that led to the HMAs and to this lawsuit.[8]  *See, e.g., C.W. Downer.*, 771 F.3d at 66; *BlueTarp*, 709 F.3d at 82.

### ii.  The Bend's extensive, ongoing, and substantial contacts with Olympia in Maine make this lawsuit foreseeable.

The foreseeability analysis requires "the defendant's contacts with the forum state must be such that he should reasonably anticipate being haled into court there."  *Nowak*, 94 F.3d at 716.  The Bend's extensive, ongoing, and substantial contacts with Olympia in Maine make this lawsuit eminently foreseeable.

Consider the First Circuit's decision in *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59 (1st Cir. 2014).  There, a Massachusetts investment bank sued a Canadian company for breach of a contract under which plaintiff served as financial advisor for the sale of defendant's business.  *Id.* at 63.  As here, the parties negotiated and executed the agreement remotely, and collaborated from their home offices for several years.  *Id.*  The First Circuit found the foreseeability requirement easily met, noting "the contract was not of a short duration or

---

[8] The Bend apparently does not dispute that the voluntariness requirement is met, as it completely omits any discussion of this requirement in its brief.

11

quickly accomplished.  Bioriginal had a four-year working relationship with Downer, including intense periods with many exchanges." *Id.* at 67.  So too here: the HMAs have a term of five years, which term was extended from starting in August 2015 to starting in December 2018.  Masterson Decl. ¶¶ 5-6; *see also* ECF Doc. 1-2 at 4.  In *C.W. Downer*, as here, defendant "reached out beyond" its home and into the forum by "entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum state." *C.W. Downer*, 771 F.3d at 67 (internal quotation omitted) ("By retaining Downer, Bioriginal actively caused Downer to undertake extensive activities on Bioriginal's behalf within Massachusetts.").  Notably, "while a plaintiff's unilateral activity cannot constitute a jurisdictional contact," the plaintiff's extensive in-forum activities could not be considered "unilateral," but were instead "undertaken at [Defendant's] request and are attributable to [Defendant]." *Id*.  The same is true here.

 Olympia provides its suite of hotel management services from its headquarters in Portland, Maine.  The Bend received a broad array of accounting, revenue management, human resources, marketing, and other operational support services from Maine.  Accordingly, The Bend "knew or should have expected [Olympia's Portland] office—its only … office, and the one with which [The Bend] negotiated the [contract]—to be the site" from which the hotel management services were provided.  *C.W. Downer*, 771 F.3d. at 67.  Indeed, Olympia alleged numerous facts in this regard in its Complaint (¶¶ 19-23), all of which The Bend simply ignores in its motion.

The First Circuit subsequently characterized the *C.W. Downer* purposeful availment analysis "as hinging on three factors: the defendant's in-forum solicitation of the plaintiff's services, the defendant's anticipation of the plaintiff's in-forum services, and the plaintiff's actual performance of extensive in-forum services." *Copia Commc'ns, LLC v. AMResorts, L.P.*,

812 F.3d 1, 6 (1st Cir. 2016).[9]  All three factors are present here.  The Bend cold-called Olympia

in Maine, which effort ultimately led to Olympia actually providing a wide range of services for

the Hotel from Maine.  And The Bend necessarily understood that Olympia is located in Maine,

that its staff are located in Maine, and that the services Olympia provided under the HMAs

would be rendered from Maine.  *Compare BlueTarp*, 709 F.3d at 80 (purposeful availment

shown by "bills issuing from Maine, employees in Maine keeping track of Matrix's purchases

and balance, Maine employees making decisions regarding credit adjustments and limits, and

Matrix communicating with those employees to address any issues that arose") *with LP Sols.*,

2018 WL 1768037, at *10  (no purposeful availment where "[a]bsent are the substantial,

ongoing, interdependent controls and commitments that are typical of franchise and services

contract cases and often justify jurisdiction.").[10]

Indeed, the First Circuit has repeatedly found purposeful availment where defendants

entered contracts that contemplated an ongoing working relationship with plaintiffs in the forum.

*See, e.g., BlueTarp*, 709 F.3d at 80; *Cossart v. United Excel Corp.*, 804 F.3d 13, 21–22 (1st Cir.

2015) (purposeful availment where "in the course of the performance of that agreement, Cossart

did significant work for United Excel in Massachusetts—as the defendants clearly foresaw he

would"); *Adelson v. Hananel*, 510 F.3d 43, 50 (1st Cir. 2007) ("[G]iven that it was Hananel who

sought this employment contract with a company whose key officers were all located in

---

[9] Unlike the defendants in *Copia*, The Bend solicited Olympia in this forum, anticipated
performance by Olympia from this forum, and received extensive services generated from this
forum.  *See* 812 F.3d at 5.

[10] As with relatedness, much of The Bend's purposeful availment discussion is devoted to
Olympia's contacts with Illinois.  There is no doubt that Olympia could have brought this action
in Illinois.  The due process inquiry concerns only whether The Bend had constitutionally
sufficient minimum contacts with Maine, however, and so Olympia's contacts with Illinois are of
little, if any, relevance.

Massachusetts and whose financial accounts were all administered out of Massachusetts, the court properly concluded that Hananel had purposefully availed himself of Massachusetts law."). Here, as in *Burger King* itself, purposeful availment is demonstrated by the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from [plaintiff's in-forum] headquarters." 471 U.S. at 480. There, as here, defendant "entered into a carefully structured [long-term] relationship that envisioned continuing and wide-reaching contacts" with plaintiff in the forum. *Id*.

It may well be that The Bend's agents never set foot in Maine. But The Bend surely sought services for the Hotel to be rendered from Maine, and accepted those services on an ongoing basis. "Even in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the forum, … many courts have found jurisdiction." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 62 (1st Cir. 2002); *see also Burger King*, 471 U.S. at 479 (defendant subject to personal jurisdiction though he "did not maintain offices in [forum] and, for all that appears from the record, has never even visited there").

Moreover, although the HMAs contain a choice of law clause selecting Illinois law, they do <u>not</u> contain a forum selection clause. *See* ECF No. 1-1 at 26. In *C.W. Downer*, the Court's finding of purposeful availment was "entirely consistent" with a similar contractual term, which "include[d] a choice-of-law provision in favor of the law of Saskatchewan … but it does not include a forum selection clause."[11] 771 F.3d at 69. The Bend notes that it "purposefully

_____

[11] The contract in *C.W. Downer* went further than the HMAs, and included explicit consent by plaintiff to jurisdiction of the Saskatchewan courts. *C.W. Downer*, 771 F.3d at 69 n. 4.

contracted" for the Illinois choice of law, but the HMAs contain no clause requiring lawsuits be filed in Illinois, and the exercise of jurisdiction here does not disturb the parties' choice to apply Illinois law. *C.W. Downer* makes clear that choice of law provisions do not defeat personal jurisdiction in a different forum.

The Bend "deliberately has engaged in significant activities within a State" and "has created 'continuing obligations' between [it]self and residents of the forum." *Burger King*, 471 U.S. at 475–76. In so doing, The Bend "manifestly has availed [it]self of the privilege of conducting business" here in Maine. *Id.* (internal quotations omitted).

### e. Exercising jurisdiction over The Bend is reasonable.

The five "Gestalt factors" typically applied to assess the reasonableness of jurisdiction are: (1) the burden on the defendant of appearing: (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) judicial economy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Adelson,* 510 F.3d at 51. "Courts assess these factors on a 'sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.'" *O'Hara Corp.*, 2020 WL 2770679, at *7 (quoting *Baskin-Robbins*, 825 F.3d at 40).

As for the defendant's burden of appearing, "mounting an out-of-state defense most always means added trouble and cost and therefore, this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *BlueTarp*, 709 F.3d at 83. The Bend is a sophisticated commercial entity, and its motion points to no special burden arising from appearing in Maine. *See* ECF Doc. 12 at 17.

"Maine has a stake in being able to provide a convenient forum for its slighted residents." *BlueTarp,* 709 F.3d at 83.  Olympia, "through its principal place of business, conducts business in Maine.  Maine has an interest in redressing harms committed against its companies by out-of-state companies." *Id*.  This factor favors the exercise of jurisdiction.  And "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Hannon v. Beard*, 524 F.3d 275, 285 (1st Cir. 2008).  Accordingly, the second and third factors favor the exercise of jurisdiction.

As for the judicial system's interest in efficient resolution of this dispute, The Bend argues that a different lawsuit between the parties currently pending in Illinois state court militates against the exercise of jurisdiction.  ECF Doc. 12 at 14-15.  But that lawsuit involves an entirely different contract under which Olympia provided a different set of services during a different period of time.  *See* ECF Doc. 13-1 (VanDeHeede Decl., Exh. 1).  Accordingly, the subject matter of that lawsuit has essentially no overlap with the subject matter of this one.  As for the Illinois choice of law clause, "federal district courts are in the regular practice of applying laws of other fora."  *C.W. Downer*, 771 F.3d at 71.  And there are no substantive social policies at issue in this fairly routine contract dispute between business entities, so this factor is a wash. *See, e.g., BlueTarp*, 709 F.3d at 83.

**III.    Subject matter jurisdiction exists because The Bend's members are citizens of Illinois and Wisconsin.**

The Bend argues for dismissal because Olympia purportedly failed to plead that subject matter jurisdiction exists—but The Bend never argues that subject matter jurisdiction does not exist.  Although Olympia explicitly pleaded that the parties, through their members, are completely diverse, *see* Compl. ¶¶ 1-2, The Bend argues that Olympia needed to identify the members of The Bend and plead the states of which they are citizens.  ECF Doc. 12 at 15-16.

16

12109633.3

The Bend's argument amounts to nothing more than litigation gamesmanship.  The Bend could have definitively addressed this issue by providing an affidavit from one of its members stating that he or she is a citizen of Maine, which would destroy diversity jurisdiction.  The Bend conspicuously declined to do so.  The Bend also argues for transfer to federal court in Illinois, which The Bend could not do under Rule 11 if it believed diversity jurisdiction does not exist.  In any event, the First Circuit case relied on by The Bend, *D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra, LLP*, addresses a plaintiff's failure to plead the citizenship of its own members, but Olympia did plead that its members are citizens of Maine.  661 F.3d 124, 126 (1st Cir. 2011).  In *Zwirn*, despite plaintiff's failure to plead the citizenship of its members, the Court did not dismiss the action but instead simply required plaintiff to file this information under seal.  *Id*. at 127.[12]

In any event, Olympia understands The Bend's jurisdictionally-relevant individuals[13] to be Michael Daniel "Dan" Murphy, Jr., Michael Jacobs, and Larry Anderson.  *See* Schultzel Decl. ¶¶ 10-12; Schultzel Exh. B.  Olympia alleged complete diversity between the parties on the basis of its understanding that Murphy resides in Wisconsin; Jacobs is a former Illinois State Senator who lives in Illinois; and Anderson is a local businessman in East Moline, Illinois, where he lives.  Schultzel Decl. ¶ 12.  None of Olympia's members are citizens of Wisconsin or Illinois.

---

[12] As the First Circuit recognized in *Zwirn* by allowing plaintiff to file the identities of its members under seal, the identity and place of residence of LLC members is generally not public. Under The Bend's approach, often there would not be a good faith basis for suing an LLC in a diversity action because of the difficulties in determining the identities and citizenship of the LLC's members.

[13] The citizenship of a limited liability company like The Bend is determined by the citizenship of its members, and if any member "is another unincorporated entity, the citizenship of each of that member's members … must then be considered."  *D.B. Zwirn,* 661 F.3d at 126.

Compl. ¶ 1.  These unrebutted facts clearly suffice to give this Court subject matter jurisdiction

under 28 U.S.C. § 1332.

**IV.    The Bend has not overcome the strong presumption in favor of Olympia's choice of forum to justify transfer.**

When considering a motion to transfer venue under 28 U.S.C. § 1404(a), "there is a

strong presumption in favor of the plaintiff's choice of forum."  *Coady v. Ashcraft & Gerel*, 223

F.3d 1, 11 (1st Cir. 2000); *see also Enercon v. Flextronics Int'l USA Inc*., No. 2:18-CV-00258-

GZS, 2018 WL 6729774, at *2 (D. Me. Dec. 21, 2018) ("unless the balance is strongly in favor

of the defendant, the plaintiff's choice of forum should rarely be disturbed") (quoting *Gulf Oil*

*Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).

The convenience of parties and witnesses does not upset this presumption: The Bend and

its witnesses are in Illinois, while Olympia and its witnesses are in Maine.  *See Banjo Buddies,*

*Inc. v. Renosky,* 156 F. Supp. 2d 22, 26 (D. Me. 2001) (transfer not appropriate "if the result is

merely to shift the inconvenience from one party to the other") (quoting 15 Wright & Miller,

Fed. Prac. & Proc. § 3848, at 383–86 (2d ed. 1986)).  Moreover, "[d]espite its burden to do so,

[The Bend] has failed to identify any witnesses or describe their potential testimony."  *Enercon,*

2018 WL 6729774, at *3.  Nor does the availability of documents topple the presumption: The

Bend's documents are in Illinois; Olympia's documents are in Maine; and in any event, virtually

all document discovery between these sophisticated commercial entities will be electronic.  *See*

*Johnson v. VCG Holding Corp*., 767 F. Supp. 2d 208, 216 (D. Me. 2011) ("This factor seems

like a holdover from a time when businesses kept important records … in paper and the difficulty

of physically accessing the paper documents and the burden of transporting them across

jurisdictions could be onerous.").  And because there is no action pending in any other federal

court, there is neither any possibility of consolidation nor any issue about the order in which

jurisdiction was obtained.  *See Johnson,* 767 F. Supp. 2d at 217 ("Here, there is no other action

pending in a different jurisdiction. This factor slightly favors the Plaintiffs.").  Although the

claims here will be decided under Illinois law, this is a straightforward contract dispute; it is

unlikely "that it makes any difference which state's substantive law applies."  *Foley v. United*

*States*, No. 09-CV-239-P-S, 2009 WL 3400997, at *4 (D. Me. Oct. 19, 2009).  The Bend has

failed to topple the strong presumption afforded to Olympia's choice to litigate this case in

Maine.

### V.      Conclusion.

From Maine, Olympia provided a wide range of professional services to The Bend under

a long-term contract.  The Bend reached into Maine to initiate the relationship with Olympia.

The Bend utilized the accounting, reporting, human resources, and other management services

that Mainers provided to the Hotel.  The Bend is subject to personal jurisdiction here in Maine,

and this Court should allow Olympia to pursue this action in its home forum.


DATED:  June 19, 2020

<div style="margin-left:40%">

*/s/ Kyle M. Noonan*
Nolan L. Reichl
Kyle M. Noonan
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
Tel:  207.791.1100
nreichl@pierceatwood.com
knoonan@pierceatwood.com

*Attorneys for Plaintiff Olympia Hotel*
*Management, LLC*

</div>

12109633.3

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused a copy of the foregoing pleading to be filed with the Court's ECF filing system, which will cause an electronic notice to be sent to counsel of record.

Dated:  June 19, 2020

/s/ Kyle M. Noonan
Kyle M. Noonan
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
Tel:  207.791.1100
knoonan@pierceatwood.com

*Attorney for Plaintiff Olympia Hotel Management LLC*

12109633.3