## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| OLYMPIA HOTEL MANAGEMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 2:20-cv-00136-NT |
| THE BEND HOTEL DEVELOPMENT COMPANY, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Before me is the Defendant's motion to dismiss the Plaintiff's Amended Complaint[1] pursuant to Federal Rules of Civil Procedure 12(b)(1) and (2), or, in the alternative, to transfer this action to the United States District Court for the Central District of Illinois pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). ("**Def.'s Mot.**") (ECF No. 12). For the reasons stated below, the motion to dismiss or transfer is **DENIED**.

## BACKGROUND

The Plaintiff, Olympia Hotel Management, LLC, ("**Olympia**") is a hotel management company that offers its services to hotels around the country. Am. Compl. ¶ 7 (ECF No. 26). It is a limited liability company ("**LLC**"), and its membership interests are held by three trusts whose trustees are Maine citizens. Am.

---

[1]       The Defendant initially filed its motion to dismiss the original Complaint. After I allowed the Plaintiff to file an Amended Complaint in order to provide additional information about the Defendant's citizenship for purposes of evaluating subject-matter jurisdiction, I agreed to construe the Defendant's motion as a motion to dismiss the Amended Complaint.

Compl. ¶ 1. Its office is located in Portland, Maine. Decl. of Sara Masterson ¶ 3 (ECF No.15-1).

The Defendant, The Bend Hotel Development Company, LLC, ("**The Bend**") is a hotel developer based out of East Moline, Illinois, and it is managed by Daniel Michael Murphy, Jr. Am. Compl. ¶ 2. The Bend is an LLC, and none of its members are Maine citizens. Am. Compl. ¶ 2 (referencing complaint filed on August 6, 2020, by The Bend in the Northern District of Illinois acknowledging that its members are citizens of Illinois). Mr. Murphy also controls a second hotel development company, Great River Property Development Hotels, LLC, ("**Great River**").[2] Am. Compl. ¶ 9; Organization Chart for The Bend Hotel Development Co., LLC (ECF No. 15-6).[3]

## I.     The Hotel Management Agreements

In fall of 2013, Olympia received a call from J. Paul Beitler, who identified himself as a representative of Great River. Decl. of Christine Chapin ¶ 4 ("**Chapin Decl.**") (ECF No. 15-3). Mr. Beitler told a representative of Olympia that, on the

---

[2]     Great River Property Development Hotels, LLC, ("**Great River**") was previously known as River Eagle Hotels LLC ("**River Eagle**"), including during some of the events relevant to this case. *See* Am. Compl. ¶ 9 (ECF No. 26); Decl. of Michael VanDeHeede ¶¶ 7, 11 ("**VanDeHeede Decl.**") (ECF No. 13). In particular, the parties to the Hotel Management Agreements ("**HMAs**") at issue are Olympia and River Eagle. Extended Stay HMA between Olympia and River Eagle 1 ("**Hyatt House HMA**") (ECF No. 26-1); Select Service HMA between Olympia and River Eagle 1 ("**Hyatt Place HMA**") (ECF No. 26-2). Both the Plaintiff and the Defendant refer almost exclusively to "Great River," rather than "River Eagle," in their pleadings, even for acts that occurred when the company was known as River Eagle. *See, e.g.*, VanDeHeede Decl. ¶ 14 (stating that Great River and Olympia Hotel Management, LLC, ("**Olympia**") entered into the HMAs); Am. Compl. ¶ 13 (same). I thus follow suit and use "Great River" for any references to either River Eagle or Great River.

[3]     Beyond the shared management, the relationship between The Bend Hotel Development, LLC, ("**The Bend**") and Great River is not crystal clear. However, an organizational chart in the record indicates that The Bend is wholly owned by Great River. Organization Chart for The Bend Hotel Development Co., LLC (ECF No. 15-6).

recommendation of Hyatt Hotels, he was considering hiring Olympia to manage a hotel he was developing in East Moline, Illinois. Chapin Decl. ¶¶ 4–5. Olympia had not solicited this call and had not previously heard of this potential business opportunity. Chapin Decl. ¶ 6.

After receiving this call, Olympia and Great River engaged in months of contract negotiations to solidify their business relationship. Chapin Decl. ¶ 7; Decl. of John Schultzel ¶ 3 ("**Schultzel Decl.**") (ECF No. 15-4). No Great River employees traveled to Maine as a part of these negotiations, but John Schultzel, Olympia's then-Vice President of Hotel Management, traveled to Illinois. Decl. of Michael VanDeHeede ¶¶ 12–13 ("**VanDeHeede Decl.**") (ECF No. 13). These negotiations involved emailing draft contracts back and forth between the parties, and negotiations continued until the contracts were signed in May 2014. Schultzel Decl. ¶¶ 4–7; emails between John Paul Beitler III and John Schultzel (ECF No. 15-5).

On or about May 9, 2014, representatives of Great River and Olympia signed two Hotel Management Agreements (the "**HMAs**" or the "**Agreements**") electronically from their respective offices.[4] Schultzel Decl. ¶ 9; *see* Extended Stay HMA between Olympia and River Eagle Hotels LLC 26 ("**Hyatt House HMA**") (ECF

---

[4]     Michael VanDeHeede, the representative of the majority owner of The Bend, contends that the parties executed the HMAs in Chicago, Illinois, and that John Schultzel traveled to Chicago for the document signing. VanDeHeede Decl. ¶¶ 12, 15. However, despite Mr. VanDeHeede's contention that he has personal knowledge of all of the facts in his declaration, VanDeHeede Decl. ¶ 1, it does not appear that he has personal knowledge of the signing of the HMAs, since he was in prison at the time, *see United States v. VanDeHeede*, No. 4:12-cr-40084 (C.D. Ill. Jan. 23, 2014) (ordering Mr. VanDeHeede to report to the Bureau of Prisons on February 11, 2014, for prison sentence of twelve months and one day). Moreover, Mr. VanDeHeede's contention is undermined by the record, which shows that the HMAs are signed by Kevin Mahaney, not John Schultzel. Hyatt House HMA 26; Hyatt Place HMA 26; Decl. of John Schultzel ¶ 9 (ECF No. 15-4). Olympia's denial that the contracts were executed in person is supported by the record, and I must construe these facts in the Plaintiff's favor.

No. 26-1); Select Service HMA between Olympia and River Eagle Hotels LLC 26 ("**Hyatt Place HMA**") (ECF No. 26-2). One HMA governs a Hyatt House hotel (an "extended stay" hotel), while the other deals with a Hyatt Place hotel (a "select service" hotel). Hyatt House HMA 1; Hyatt Place HMA 1; VanDeHeede Decl. ¶¶ 5, 14. The Bend was developing both hotels (collectively, the "**Hotel**"), and both were to be housed within the same structure. Am. Compl. ¶ 8. Both HMAs are identical in all respects material to this action. *Compare* Hyatt House HMA, *with* Hyatt Place HMA. *See* Am. Compl. ¶ 14; VanDeHeede Decl. ¶ 14.

Pursuant to the HMAs, Olympia was responsible for, among other things, employment decisions regarding Hotel staff; payroll; creating customer service and management policies; negotiating hotel contracts; and providing financial management, budgeting, and reporting services, including providing Great River with weekly and monthly financial reports. Hyatt House HMA §§ 2.1, 2.2, 2.4, 2.8; Hyatt Place HMA §§ 2.1, 2.2, 2.4, 2.8. In exchange for these and other services, Great River was required to pay Olympia a monthly management fee. Hyatt House HMA § 4.1; Hyatt Place HMA § 4.1.

The HMAs also authorized Olympia to establish one or more bank accounts to be used to pay the Hotel's expenses (the "**Operating Account**"). Hyatt House HMA § 3.1(a); Hyatt Place HMA § 3.1(a). The HMAs obligated Great River to pay the Hotel's costs and expenses out of the Operating Account. Hyatt House HMA § 3.2; Hyatt Place HMA § 3.2. These expenses were to include "[r]easonable travel expenses incurred by" Olympia's officers and employees "for the direct benefit of the Hotel."

4

Hyatt House HMA § 3.2(k); Hyatt Place HMA § 3.2(k). However, fees for Olympia's "off-site accounting and financial reporting services through [its] central accounting facilities under [the] Agreement" and "fees, charges or expenses for any offsite employees" of Olympia were not to be paid out of the Operating Account. Hyatt House HMA § 3.2(h); Hyatt Place HMA § 3.2(h). Under the terms of the HMAs, the Operating Account was required to have a "minimum working capital balance" of $150,000. Hyatt House HMA § 3.1(a); Hyatt Place HMA § 3.1(a).

After the Hotel opened, the HMAs permitted Great River to terminate the Agreements if it paid Olympia a termination fee (the "**Termination Fee**"). Hyatt House HMA §§ 4.2, 5.1; Hyatt Place HMA §§ 4.2, 5.1. Olympia was permitted to terminate the HMAs if Great River failed to abide by any of the material terms and conditions of the Agreements. Hyatt House HMA § 5.2; Hyatt Place HMA § 5.2.

A few other provisions of these Agreements are relevant here. The HMAs identify Olympia as having a Maine mailing address and instruct Great River to send any notices to that Maine mailing address. Hyatt House HMA 1, § 7.1; Hyatt Place HMA 1, § 7.1. And they contain a choice-of-law provision declaring that Illinois law governs any disputes surrounding the Agreements. Hyatt House HMA § 7.3; Hyatt Place HMA § 7.3. The Agreements do not contain a forum-selection clause.

## II. The Working Relationship between Olympia and Great River/The Bend

After the business relationship between Olympia and Great River was solidified, Olympia performed various services for Great River (and later, The Bend). Chapin Decl. ¶ 8; Schultzel Decl. ¶¶ 14–24; Decl. of Daniel J. Flaherty ¶¶ 3–6

("**Flaherty Decl.**") (ECF No. 15-7). Olympia's Chief Financial Officer, Daniel Flaherty, monitored and helped manage the cash flow at the Hotel, which required his "consistent attention each month." Flaherty Decl. ¶ 6. Mr. Flaherty also would communicate via email with Great River about the Hotel's cash flow and with the on-site General Manager about the Operating Account. Flaherty Decl. ¶¶ 7–13. From late 2018 until the termination of the HMAs, Olympia staff spent approximately 8–10 hours per week on accounting, payroll, accounts payable management, and insurance management. Flaherty Decl. ¶ 15. This included daily reconciliation of the Operating Account, filing the Hotel's monthly sales tax returns, and completing reconciliations for the Hotel's month-end financial statements. Flaherty Decl. ¶ 18. Olympia's Director of Revenue Management assisted the on-site General Manager with setting the Hotel's rate structure and was in weekly contact with Hotel staff. Schultzel Decl. ¶ 22. Olympia employees also conducted operational oversight of the Hotel, including supervising the on-site General Manager; assisting the Hotel with marketing, account solicitation, and other sales activities; and helping develop the Hotel's food and beverage program. Chapin Decl. ¶ 9; Schultzel Decl. ¶¶ 15, 18, 20. These employees and others provided their services to Great River (and later, The Bend) out of Olympia's Portland office. Chapin Decl. ¶ 9; Schultzel Decl. ¶¶ 2, 18–23; Flaherty Decl. ¶¶ 2, 16–19. However, some Olympia employees traveled to Illinois on various occasions. VanDeHeede Decl. ¶¶ 17–20, 22–24; Decl. of Raymond Stoddard ¶¶ 13–18 ("**Stoddard Decl.**") (ECF No. 16-1).

Other Olympia employees, such as the Hotel's General Manager, its Human Resources Manager, and its maintenance supervisor worked on-site at the Hotel. Stoddard Decl. ¶¶ 4, 8, 12, 29, 32. These on-site employees would communicate with Olympia's Portland office from time to time. Stoddard Decl. ¶¶ 7, 18, 19, 29, 32. For example, the on-site General Manager spoke with Olympia's Maine-based Director of Operations at least "a handful of times" per month. Stoddard Decl. ¶¶ 17–18; *accord* Decl. of Richard Martin ¶¶ 2–3 (ECF No. 15-13).

In 2017, Great River and Olympia executed amendments to the HMAs. VanDeHeede Decl. ¶ 16. These amendments assigned Great River's interests in the Agreements to The Bend.[5] VanDeHeede Decl. ¶ 16; ECF Nos. 26-3, 26-4.

The Hotel opened in December 2018. Flaherty Decl. ¶ 5. After this point, the balance in the Operating Account remained chronically low, Flaherty Decl. ¶ 6, and Olympia alleges that The Bend persistently failed to maintain the $150,000 minimum working capital balance in the Operating Account, despite Olympia's warnings, Am. Compl. ¶¶ 29–30. In March 2020, Olympia notified The Bend that it was in default under the HMAs due to its alleged failure to maintain this minimum balance, and Olympia claims that The Bend failed to cure this alleged default. Am. Compl. ¶¶ 31–32. In April 2020, Olympia notified The Bend that it was terminating the HMAs, and it appears Olympia also requested that The Bend pay the Termination Fees. Am. Compl. ¶¶ 33–34. The Bend refused. Am. Compl. ¶¶ 34–35.

---

[5]     These amendments also made some substantive changes to the HMAs that are not relevant to the disposition of the Defendant's motion. *See* ECF Nos. 26-3, 26-4.

7

Olympia subsequently filed suit in this Court seeking a declaratory judgment that it properly terminated the HMAs and that The Bend owes Olympia the Termination Fees. Am. Compl. ¶¶ 36–40. Olympia also alleges a breach of contract claim premised on The Bend's refusal to pay the Termination Fees. Am. Compl. ¶¶ 41–45. Because the amount in controversy exceeds $75,000, the Plaintiff invokes this Court's diversity jurisdiction. Am. Compl. ¶ 3.

## DISCUSSION

### I.   Subject-Matter Jurisdiction

A federal court has subject-matter jurisdiction in cases where the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1). The Defendant has never seriously contested that these prerequisites are met and thus that diversity jurisdiction exists. *See* Def.'s Mot. 15–17. The Defendant moved to dismiss this action for lack of subject-matter jurisdiction solely because Olympia *insufficiently alleged* the citizenship of The Bend, not because it believed diversity was genuinely lacking. Def.'s Mot. 15–17 ("Olympia's Complaint should be dismissed for a failure to allege sufficient facts for this Court to determine that it has subject matter [sic] jurisdiction over this suit."). The Plaintiff has cured this deficiency in its Amended Complaint, and I find that the Plaintiff has alleged sufficient facts to invoke this Court's diversity jurisdiction. The Defendant's motion to dismiss for lack of subject-matter jurisdiction is **DENIED**.

## II.   Personal Jurisdiction

### A.   Legal Standard

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing that personal jurisdiction exists over the defendant. *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16 (1st Cir. 2019). In this case, neither party requested an evidentiary hearing, and so I apply the "prima facie standard" to determine if the plaintiff has met its burden. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50–51 (1st Cir. 2002). Under the prima facie standard, the plaintiff is required to "proffer[ ] evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *PREP Tours,* 913 F.3d at 16 (quoting *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)); *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). Ordinarily, the plaintiff "is obliged to adduce evidence of specific facts" beyond the allegations of the complaint. *PREP Tours*, 913 F.3d at 16 (internal quotations omitted). I take "the plaintiff's properly documented evidentiary proffers as true and construe them in the light most favorable to the plaintiff's jurisdictional claim." *Id.* at 16–17 (alterations, quotation marks, and citations omitted). I also consider undisputed facts that are offered by the defendant. *Id.*; *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).

### B.   Analysis

The Defendant argues that I cannot exercise personal jurisdiction over it because it lacks legally sufficient contacts with Maine. Def.'s Mot. 5–15. The Plaintiff counters that specific personal jurisdiction exists based on Mr. Beitler's solicitation

9

call, the protracted contract negotiations between the parties, the interstate communications between the parties, and the breadth of services that Olympia provided to The Bend from its Maine office. Pl.'s Opp'n to Def.'s Mot. to Dismiss or Otherwise Transfer 1–6 ("**Pl.'s Opp'n**") (ECF No. 15).

### 1.   Personal Jurisdiction Standard

There are two ways of establishing personal jurisdiction over a defendant: general or specific. *See Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 31 (1st Cir. 2010). Here, the Plaintiff asserts only that the Court has specific jurisdiction over the Defendant. Pl.'s Opp'n 7. Specific jurisdiction "may only be relied upon where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *Cossaboon*, 600 F.3d at 31 (internal quotations omitted).

Personal jurisdiction must meet the requirements of the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See LP Sols. LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018); *Cossaboon*, 600 F.3d at 32. Maine's long-arm statute specifically identifies the "transaction of any business within this State" as conduct conferring personal jurisdiction. 14 M.R.S.A. § 704-A(2). Maine's statute also provides that,

> to insure maximum protection to citizens of this State, [this section] shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

*Id.* § 704-A(1); *see also LP Sols.*, 907 F.3d at 102. Under the Due Process Clause, a court may "exercise jurisdiction over an out-of-forum defendant only if, with respect to the claims at issue, the defendant has 'certain minimum contacts with the forum

such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *PREP Tours,* 913 F.3d at 17 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

To establish specific jurisdiction the plaintiff must show " 'an affiliation between the forum and the controversy' underlying the plaintiff's claims." *Id.* (internal alterations omitted) (quoting *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The First Circuit applies a three-part test to determine whether this "minimum contacts" requirement is met. *Id.* First, the plaintiff's claim must be sufficiently related to the defendant's in-forum activities; second, the defendant must have purposefully availed itself of the privilege of doing business in the forum state; and third, assertion of jurisdiction over the defendant must be reasonable. *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018).

### 2.  Application

#### a.  Relatedness

The relatedness prong of the personal jurisdiction test "ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 623 (1st Cir. 2001). "[T]he claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992). "In this inquiry, foreseeability is critical." *Id.* However, this is a "flexible, relaxed standard," requiring only a

11

"demonstrable nexus between the complaint's claims and the activities in the forum that properly may be attributed to the defendants." *PREP Tours*, 913 F.3d at 18 (internal quotations omitted). "[T]he content of the parties' interactions" is what determines whether the defendant has "constitutionally significant contacts" with the forum. *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 290 (1st Cir. 1999).

The Plaintiff asserts two contract-based causes of action that arise out of The Bend's alleged failure to pay the Termination Fees. Am. Compl. ¶¶ 36–45. Because the mere existence of a contract is insufficient to establish minimum contacts, I must apply a "contract-plus" analysis. *See Swiss Am. Bank*, 274 F.3d at 621; *Phillips Exeter*, 196 F.3d at 289. I must determine "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." *Phillips Exeter*, 196 F.3d at 289. And I must also examine "the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 66 (1st Cir. 2014) (quoting *Daynard*, 290 F.3d at 52).

Here, Great River's contacts with Maine directly led to the formation of the HMAs, Great River continued to have significant contacts with Maine as a part of the contract negotiations, the HMAs contemplated that Great River would have persistent contact with Maine, and Great River (and later, The Bend) continued to have significant contacts with Maine throughout the parties' actual course of dealing. First, the act that sparked the contract negotiations was Mr. Beitler's cold call to

Olympia's office in Maine.[6] The Defendant seeks to downplay this fact, implying that this cold call is irrelevant because "[i]t did not matter to The Bend that Olympia was in Maine, and The Bend did not seek out Olympia on that basis." *See* Def.'s Reply in Support of its Mot. to Dismiss or Otherwise Transfer 3–4 ("**Def.'s Reply**") (ECF No. 16). But the fact remains that Olympia did not solicit Great River's business; rather it was Great River who solicited Olympia.

Second, the months-long negotiations involved a back-and-forth between Great River in Illinois and Olympia in Maine, which included Great River sending draft contracts to, and receiving draft contracts from, Maine. This course of dealing evidence is "powerful" evidence of The Bend's contacts with Maine. *See C.W. Downer*, 771 F.3d at 66; *cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) ("Rudzewicz deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise . . . ." (internal quotations omitted)).

Third, the terms of the HMAs contemplate persistent contacts with Maine. The HMAs clearly identify Olympia's Maine address, and they outline a number of services that Olympia was obligated to perform in its role as operator of the Hotel.

---

[6]     Although Mr. Beitler identified himself at the time as a representative of Great River, and although the Plaintiff acknowledges that this was an action taken by Great River, *see* Decl. of Christine Chapin ¶¶ 4, 7 (ECF No. 15-3), the Plaintiff imputes this action to The Bend, *see, e.g.*, Pl.'s Opp'n to Def.'s Mot. to Dismiss or Otherwise Transfer 1 (ECF No. 15) ("The Bend reached into Maine with a cold call to Olympia and subsequently negotiated a multi-year contract . . . ."). The Bend similarly treats the two companies as one. *See, e.g.*, Def.'s Mot. to Dismiss Pl.'s Compl. or Otherwise Transfer to the Central District of Illinois 3 ("**Def.'s Mot.**") (referring to The Bend signing the original HMAs, rather than Great River). The Defendant never argues that Great River and The Bend should be considered separately or that Great River's Maine contacts should not be attributed to The Bend, and I consider any such argument waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).

The Defendant never argues that it was unaware that Olympia would be performing many of its services from its Maine office. Indeed, the HMAs explicitly contemplated that Olympia *would* perform at least some of these services from Maine. The HMAs refer to Olympia's "off-site accounting and financial reporting services" and "offsite employees." And they required The Bend to pay for Olympia's reasonable travel expenses, implying Olympia's need to travel from its home office in Maine to the Hotel. That the HMAs contemplated Olympia's "off-site" services and its need for occasional travel is recognition of The Bend's intent to contract with a Maine entity that would be performing at least some of its services from Maine.

Fourth, the parties' course of dealing involved Olympia providing a multitude of services from its Maine office, including hotel operations, sales, marketing, accounting, budgeting, and payroll, some on a weekly basis. Olympia's performance of these services on behalf of The Bend in the forum state is jurisdictionally significant. *See LP Sols.*, 907 F.3d at 106 ("We upheld the exercise of jurisdiction in *Baskin-Robbins* in part because the defendant caused the plaintiff to undertake 'a plethora of activities on its behalf' in the forum." (quoting 825 F.3d at 39)). The Defendant tries to minimize the importance of Olympia's services and seeks to claim that Olympia's Maine employees had infrequent involvement with the Hotel. *See* Def.'s Reply 4–5. But in doing so, the Defendant concedes that Olympia's Maine employees communicated with the Hotel employees on the ground at least on a monthly basis. Def.'s Reply 6 ("[The on-site General Manager] and his team performed the essential work in operating the Hotel from East Moline on a daily

14

basis, as opposed to the bi-monthly, monthly, or by-request services performed by Olympia's Maine-based employees."). While the Defendant portrays monthly communications with the forum state as being insufficient to confer personal jurisdiction, the opposite is true. *Cf. Baskin-Robbins*, 825 F.3d at 39 (describing the importance of the parties' "regular[ ]" monthly communications to the purposeful availment analysis).

An additional relevant consideration in evaluating the extent of The Bend's contacts with Maine is the fact that the HMAs obligated The Bend to make monthly payments to Olympia, that is, to send monthly payments to Maine. The Plaintiff also claims that The Bend was obligated to pay Olympia the Termination Fees, which likewise was due to Olympia in Maine. The alleged breach thus derives from a failure to make payments allegedly due to Olympia in Maine. *See LP Sols., LLC v. Duchossois*, No. 2:18-CV-25-DBH, 2018 WL 1768037, at *7 (D. Me. Apr. 11, 2018), *aff'd*, 907 F.3d 95 (1st Cir. 2018). Although "the location where payments are due under a contract . . . alone does not possess decretory significance," it remains "a meaningful datum for jurisdictional purposes." *Phillips Exeter*, 196 F.3d at 291; *cf. Baskin-Robbins*, 825 F.3d at 38–39 (finding "a constant stream of payments" to be more jurisdictionally significant than occasional payments).

In arguing that its Maine contacts are not sufficiently related to the Plaintiff's claims, the Defendant relies primarily on *Phillips Exeter Academy v. Howard Phillips Fund*. Def.'s Mot. 11. In *Phillips Exeter*, the First Circuit held that a New Hampshire court lacked personal jurisdiction over a Florida-based fund because the fund's

contacts with New Hampshire were limited to annual payments to a New Hampshire school. 196 F.3d at 289. In contrast, The Bend maintained an ongoing relationship with Olympia that involved not only monthly, rather than annual, payments, but also more widespread contacts and communications. *Phillips Exeter* is not a good comparator given the disparity in the degree of forum contacts involved in that case versus this one. Better comparators are the First Circuit's cases finding personal jurisdiction where there existed ongoing contractual relationships involving services performed in the forum state. *See Baskin-Robbins*, 825 F.3d at 36 n.4 (finding that defendant's ongoing performance of its contractual obligations in the forum state was enough to establish relatedness); *C.W. Downer*, 771 F.3d at 66 (holding that relatedness was satisfied where plaintiff's claims arose from alleged breach of a contract requiring ongoing performance in the forum state).

In particular, this case has clear parallels to *C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, a case in which the First Circuit did "not consider the minimum contacts issue to be very close." *See* 771 F.3d at 69. In *C.W. Downer*, the defendant solicited the plaintiff's business, remotely negotiated a contract with the plaintiff, and electronically signed the contract. *See id.* at 63. Over the course of the contract, the defendant made payments to the plaintiff in the forum state, the plaintiff's staff performed services for the defendant in the forum state, and the parties communicated regularly with one another. *See id.* at 63–64. These same contacts exist here, and, as in *C.W. Downer*, I do not consider the minimum contacts issue to be a close call.

16

In its analysis of the relatedness inquiry, the Defendant emphasizes Olympia's contacts to Illinois.[7] *See* Def. Mot. 11–12. But this misses the point. The relatedness inquiry revolves around the *defendant's* contacts with the *forum state*, *Baskin-Robbins*, 825 F.3d at 35, not the *plaintiff's* contacts with some other potential forum. Simply put, for purposes of the personal jurisdiction analysis, Olympia's contacts to Illinois are irrelevant. *See Harlow v. Children's Hosp.*, 432 F.3d 50, 67 (1st Cir. 2005) ("[T]he purpose of the [due process] inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest . . . ." (quoting *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 151 (1st Cir. 1995))).

In sum, as to the relatedness prong, I conclude that the Plaintiff has established a demonstrable nexus between its claims related to the HMAs and The Bend's contacts with Maine. I also conclude that The Bend's contacts with Maine were instrumental to the formation of the contract, the contract negotiations, the contemplated future consequences of the HMAs, the terms of the HMAs, and the parties' actual course of dealing.

**b.  Purposeful Availment**

The second prong—the purposeful availment inquiry—focuses on the defendant's "intentionality." *Swiss Am. Bank*, 274 F.3d at 623. The plaintiff must point to "some act by which the defendant purposefully avail[ed] itself of the privilege

---

[7]    The Bend also relies on its employees' lack of travel to Maine. Def.'s Mot. 5. This is irrelevant. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").

of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475 (internal quotations omitted); *see also PREP Tours*, 913 F.3d at 19. Due to the nature of this inquiry, "the two cornerstones of purposeful availment are voluntariness and foreseeability." *PREP Tours*, 913 F.3d at 19–20 (internal quotations omitted). Voluntariness requires that the defendant's contacts with the forum "proximately result" from the defendant's own actions, rather than the unilateral action of another. *Id.* at 20 (internal quotations omitted). Foreseeability requires a showing that the defendant's connections with the forum "are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474). Thus, "random, fortuitous, or attenuated contacts" are insufficient. *Knox v. MetalForming, Inc.*, 914 F.3d 685, 691 (1st Cir. 2019) (internal quotations omitted). In contract cases, jurisdiction can be "reasonably foreseeable when the defendant deliberately directed its efforts toward the forum state" or "entered a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." *LP Sols.*, 907 F.3d at 104 (internal alterations and quotations omitted).

Many of the Maine contacts discussed above are equally relevant to the purposeful availment analysis. First, when Mr. Beitler reached out to Maine by calling Olympia, he was purposefully availing himself of the privilege of conducting business in Maine. *See C.W. Downer*, 771 F.3d at 66 (finding that solicitation of business "strongly supports the case for purposeful availment"). This is because a party who reaches out to another state to " 'create continuing relationships and

obligations with citizens of [that] state' [is] subject to regulation and sanctions in [that] State for the consequences of [its] activities." *Burger King*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)).

Second, the parties negotiated a contract that explicitly contemplated that Olympia would perform extensive services in Maine. A lengthy contract requiring the plaintiff "to undertake extensive activities" on the defendant's behalf in the forum state is significant in the purposeful availment inquiry. *C.W. Downer*, 771 F.3d at 67.

Third, Olympia did perform significant services for the benefit of The Bend from its Maine office. "This pattern of repetitive interactions involving [Maine] is jurisdictionally significant . . . ." *Baskin-Robbins*, 825 F.3d at 39. As the *Baskin-Robbins* court put it:

> "The short of it is that [the plaintiff's] performance of these manifold activities—most of which [the defendant] irrefutably knew were taking place in [the forum state]—was vital to the continuation of the [parties'] relationship. To this extent, [the defendant] deliberately targeted the [forum state's] economy and reasonably should have foreseen that, if a controversy developed, it might be haled into a . . . court [in the forum state]."

*Id.*

The Defendant seeks to compare this case to *Lyle Richards International, Ltd. v. Ashworth, Inc.*, Def.'s Reply 6, but this comparison is inapt.[8] In *Lyle Richards*, the

---

[8]      The Defendant also relies on a case from this Court, *Telford Aviation, Inc. v. Raycom National, Inc.*, to argue that a lack of a continuing obligation to Maine consumers means that it did not intend to avail itself of Maine law. Def.'s Reply in Support of its Mot. to Dismiss or Otherwise Transfer 3 (ECF No. 16) (citing 122 F. Supp. 2d 44 (D. Me. 2000)). Despite the Defendant's assertion to the contrary, *Telford*'s facts are far afield. *Telford* was a "passive purchaser" case, involving a nonresident defendant who merely purchased and received goods from the forum state. *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 68 (1st Cir. 2014). The Bend, on the other hand, was not a passive actor. It

First Circuit emphasized that the defendant had never solicited the plaintiff's business, a fact that was particularly important under the Massachusetts long-arm statute governing that case. *See* 132 F.3d 111, 112–13 (1st Cir. 1997). Here, Great River *did* solicit Olympia's business.

Another way in which *Lyle Richards* is distinguishable is the location of contract performance. The contract in *Lyle Richards* required the plaintiff, a Massachusetts company, to complete most of its performance in Asia and obligated it "to undertake no specific contractual responsibilities in Massachusetts." *Id.* The plaintiff's presence in Massachusetts thus mattered little in determining whether Massachusetts had personal jurisdiction. *Id.* The Defendant analogizes *Lyle Richards* to this case, arguing that Olympia was never required to perform its duties in Maine. Def.'s Reply 6. But in evaluating whether a defendant purposefully availed itself of the forum state, what matters is not where the contract *required* services to be performed, but rather where the defendant *anticipated* that the services would be performed and where the plaintiff *actually performed* those services. *See Baskin-Robbins*, 825 F.3d at 39 ("[In] in-forum service contract cases . . . a finding of purposeful availment is typically based, in part, on the defendant's anticipation that the plaintiff will provide in-forum services and the plaintiff's provision of those in-forum services."); *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 6 (1st Cir. 2016) (describing rationale for finding personal jurisdiction in *C.W. Downer*).

---

"actively negotiated [a] contract [that] required interactive communications between the two companies for an extended period of time." *See id.*

In *Lyle Richards*, the contract contemplated that the plaintiff would perform its duties in Asia, so its place of performance did not weigh in favor of personal jurisdiction in Massachusetts. But in the case of Olympia, the contract contemplated that it would perform many of its duties in Maine, and it did in fact to do so. *See Burger King*, 471 U.S. at 475–76 ("[W]here the defendant . . . has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (internal citations and quotations omitted)).

I conclude that The Bend purposefully availed itself of the privilege of conducting activities within the forum State.

### c.   Reasonableness

The third prong of the three-part test considers the reasonableness of exercising personal jurisdiction over a defendant. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. The five "Gestalt factors" typically applied to assess reasonableness are: (1) the burden on the defendant of appearing; (2) "the forum state's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) judicial economy; and (5) the "common interests of all sovereigns in promoting substantive social policies." *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007) (internal quotations

21

omitted). Courts assess these factors on a "sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Baskin-Robbins*, 825 F.3d at 40 (internal quotations omitted). On the flip side, where the plaintiff's "showing on the first two prongs of the inquiry is strong," the defendant "carries the burden of defeating jurisdiction with a similarly strong showing of unfairness." *C.W. Downer*, 771 F.3d at 71. Because the Plaintiff has made a strong showing on the first two factors, it is the Defendant's heavy burden to demonstrate why an assertion of personal jurisdiction would be unfair.

I begin with the burden on the Defendant. The Defendant emphasizes its burden in having to defend itself in Maine, including the travel required and having to secure local counsel. Def.'s Mot. 14. This is an argument that "is more appropriately dealt with under the law of forum non conveniens or change of venue." *Harlow*, 432 F.3d at 68; *accord Burger King*, 471 U.S. at 483–84. In any event, the burden is only constitutionally significant if the defendant can demonstrate "some kind of special or unusual burden." *Baskin-Robbins*, 825 F.3d at 40 (quoting *Hannon v. Beard*, 524 F.3d 275, 285 (1st Cir. 2008)). The need for The Bend to travel from Illinois to Maine does not qualify. *See id.* ("Where, as here, parties of substantial means are involved, cross-country travel ordinarily does not qualify as a special or unusual burden."). "Mounting an out-of-state defense most always means added trouble and cost, and modern travel creates no especially ponderous burden for business travelers." *C.W. Downer*, 771 F.3d at 70 (internal citations and quotations omitted).

As for the forum state's interest in adjudicating the dispute, this factor, too, cuts in the Plaintiff's favor due to Maine's interest in providing its residents with a convenient forum for redressing injuries by out-of-state actors. *See Baskin-Robbins*, 825 F.3d at 40; *C.W. Downer*, 771 F.3d at 70 ("Massachusetts has significant interests in providing a convenient forum for disputes involving its citizens and in ensuring that its companies have easy access to a forum when their commercial contracts are said to be breached by out-of-state defendants." (internal quotations omitted)). The Defendant argues that Maine's interest in resolving this dispute is no greater than that of Illinois. Def.'s Mot. 14. But that answers the wrong question. It does not matter whether Illinois has an equal or even greater interest than Maine. *See Baskin-Robbins*, 825 F.3d at 40. What matters is only the extent of the forum state's interest, which is significant here.

The third factor is the plaintiff's interest in obtaining convenient and effective relief. I do not doubt that the Plaintiff would receive its day in court in the Central District of Illinois, just as it would in the District of Maine. But the Plaintiff's choice of forum is also entitled to some measure of deference. *Id.* at 41. This factor, too, tips in the Plaintiff's favor.

The fourth factor, judicial economy, is a wash. The Defendant points to another lawsuit occurring in Illinois as reason for this case to proceed in Illinois as well. Def.'s Mot. 14–15. But as the Defendant concedes, this lawsuit relates to an entirely different contract and an entirely different type of alleged breach. *See* Def.'s Mot. 14–15. I do not see how the existence of that lawsuit bears any relevance to this dispute.

The final factor examines the common interests of all sovereigns in promoting substantive social policies. The Defendant points to the HMAs' choice-of-law provisions, which establish that Illinois law governs any contractual disputes, as evidence that Illinois has a heightened interest in this litigation. Def.'s Mot. 2, 11–12. But a state's "interests in providing a forum are independent of the substantive law applied by the forum." *C.W. Downer*, 771 F.3d at 70 n.6. Even though Illinois law will apply in this action, a Maine federal court "is fully capable of applying" Illinois law. *See Baskin-Robbins*, 825 F.3d at 41; *C.W. Downer*, 771 F.3d at 70–71 (concluding the same with respect to Saskatchewan law, even where the American court might need to decide a novel issue under Canadian law). Illinois surely has an interest in this matter, but it does not trump Maine's. A choice-of-law provision is distinct from a forum-selection clause. *See C.W. Downer*, 771 F.3d at 69 n.4. And if the parties had intended for lawsuits relating to their contractual arrangements to be confined to the Illinois courts, they could have contractually agreed to do so.

The question to be answered here is not whether Illinois has a stronger interest in this matter but whether jurisdiction in Maine is *unconstitutional*. *See Burger King*, 471 U.S. at 483. Given the Plaintiff's strong showing on the relatedness and purposeful availment prongs, it is the Defendant's burden to make a compelling case that asserting personal jurisdiction over it would be unfair. *See C.W. Downer*, 771 F.3d at 71. The Defendant has not met that burden. The Defendant's motion to dismiss this case for lack of personal jurisdiction is **DENIED**.

### III.    Forum Non Conveniens

The Defendant argues in the alternative that, if this case is not dismissed for lack of personal jurisdiction, it should be transferred to the Central District of Illinois pursuant to 28 U.S.C. § 1404(a).[9] "[A] district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In doing so, the district court may consider "the convenience of parties and witnesses," as well as "the interest of justice." 28 U.S.C. § 1404(a). However, there is a strong presumption in favor of the plaintiff's choice of forum. *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000). It is the defendant's burden to prove why a transfer should be ordered. *Id.*

In my view, the scales are in equipoise with regard to the convenience of the parties and witnesses and the interests of justice. The Defendant first contends that all of its employees (and, presumably, its witnesses) are located in Illinois. Def.'s Mot. 17. But the Plaintiff's are in Maine. Pl.'s Opp'n 18. The Defendant next contends that it has no connection to Maine but that Olympia has several connections to Illinois because it is registered as an LLC in Illinois and manages at least three hotel properties there. Def.'s Mot. 17. But I do not see what relevance Olympia's unrelated Illinois connections have to this inquiry, particularly because there is no evidence in the record that these other Illinois connections would ease Olympia's burden of

---

[9]    The Defendant also requests a venue transfer pursuant to 28 U.S.C. § 1406(a). Def.'s Mot. 17. The Defendant argues that a case may be transferred pursuant to § 1406(a) if venue is improper or the Court lacks personal jurisdiction. In the case of the former, the Defendant never argues that venue is *improper*, but only that the Central District of Illinois is a *better* venue. Def.'s Mot. 17–18. I thus consider an argument for transfer on the ground of improper venue to be waived.

litigating this case in Illinois. Finally, the Defendant complains that it was required "to seek newly appointed legal counsel" in Maine, while Olympia already had counsel in Illinois due to the other legal dispute between the parties. Def.'s Mot. 17–18. I doubt the relevance of this purported disparity, but in any event, it is moot. Both parties now have counsel in Illinois, and both parties now have counsel in Maine. The Defendant has failed to meet its burden to justify transferring this case to another forum. The motion to transfer is **DENIED**.

## CONCLUSION

For the reasons stated above, the Defendant's motion (ECF No. 12) is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 27th day of October, 2020.